IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARK HEWARD, Individually and as
Parent and Next Friend of STUDENT
DOE, a minor, *et al*.,

    *Plaintiffs*,

    v.

BOARD OF EDUCATION OF ANNE
ARUNDEL COUNTY, *et al*.,

    *Defendants*.

Civil No. 1:23-cv-00195-ELH

## MEMORANDUM OPINION

The plaintiffs in this case, parents of a 13-year-old public school student in Anne Arundel

County, allege that their daughter, K.H., was summarily and unjustly suspended from school based

on an unfounded determination that she engaged in racially biased conduct.

In particular, this case arises from discipline imposed upon the student for allegedly

sending a "blackface" photo of herself to eight of her friends, via Snapchat, while at home on a

Saturday. The school imposed the suspension on Monday—the next school day—within hours of

learning about the photo, based on the student's alleged "bias behavior" and misuse of social

media, as well as a claim that the conduct caused a disruption at school. However, the student

denies that she wore "blackface." Instead, she alleges that she wore gold face paint purchased by

her mother for a school football game. And, she insists that she never intended to offend anyone

and that her conduct did not disrupt school.

Plaintiffs Mark and Belinda Heward, as parents and next friends of K.H. (also referred to

as "Student Doe" or "Student"), a student at Severna Park High School (the "School" or "SPHS"),

filed suit in the Circuit Court for Anne Arundel County against defendants Board of Education of

Anne Arundel County ("BOE" or "Board"); School Principal Patrick Bathras; Assistant Principal

Paige Chang; and Regional Assistant Superintendent Janine Robinson, asserting a host of claims, including violations of K.H.'s federal and State constitutional rights to due process and free speech. ECF 1-1; ECF 2 (same).  Defendants timely removed the case to federal court, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, asserting federal question jurisdiction.  ECF 1.

Plaintiffs seek compensatory and punitive damages.  ECF 2 at 35.  They also seek declaratory and injunctive relief, including expungement of the incident from K.H.'s School record, *id.* at 35–36, an "apology," and a "clarification" to others at the School "to clear Student Doe's name and [the] family's name of any wrongdoing."  *Id.* at 36.

The Amended Complaint (ECF 1-1; ECF 2) is the operative pleading.[1]  In a "kitchen sink" approach, it contains ten counts as to all defendants.[2]  Count I alleges Negligence (ECF 2, ¶¶ 116–28); Count II alleges "Invasion of Privacy (Unreasonable Publicity)" (*id.* ¶¶ 129–36); Count III asserts "Invasion of Privacy (False Light)" (*id.* ¶¶ 137–44); Count IV asserts Defamation (*id.* ¶¶ 145–50); Count V alleges Breach of Fiduciary Duty (*id.* ¶¶ 151–54); Counts VI, VII, and VIII allege violations, respectively, of Articles 24, 26, and 40 of the Maryland Declaration of Rights, which are generally the Maryland equivalents to the Fourteenth Amendment, the Fourth Amendment, and the First Amendment, respectively (*id.* ¶¶ 155–201)[3]; Count IX alleges violations

---

[1] The Amended Complaint (ECF 1-1; ECF 2) was filed in State court before the original Complaint was ever served.  ECF 1, ¶ 2.

[2] The Amended Complaint is a quintessential example of shotgun pleading. Indeed, it seems as if counsel rifled through a hornbook and selected every conceivable claim. Such pleadings impose undue burdens on litigants and the judiciary. *See, e.g.*, *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 979-80 & n.54 (11th Cir. 2008) (cataloging the negative consequences of shotgun pleading), *abrogation on other grounds recognized*, *inter alia*, *by Doscher v. Holding*, 2023 WL 6060559 (11th Cir. Sept. 18, 2023).

[3] As discussed, *infra*, "Article 24 of the Maryland Declaration of Rights is the state law equivalent of the Fourteenth Amendment of the United States."  *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496 (D. Md. 2013) (quotation marks omitted); *see Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 4 n.11, 838 A.2d 1225, 1237 n.11 (2003); *see also Taylor v. Go-Getters, Inc.*, ELH-

of the First and Fourteenth Amendments to the Constitution, lodged pursuant to 42 U.S.C. § 1983 (*id.* ¶¶ 202–17); and Count X asserts a violation of the Fourteenth Amendment, also pursuant to § 1983 (*id.* ¶¶ 218–32).

Defendants have moved to dismiss the suit pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Rule 56. ECF 15. Their motion is supported by a memorandum (ECF 15-1) (collectively, the "Motion") and twenty-eight exhibits. ECF 15-2 to ECF 15-29. Some of the exhibits were filed under seal, and are docketed at ECF 14-1 to ECF 14-13. However, pursuant to a Court Order (ECF 32, ECF 33), redacted versions of some of the sealed exhibits now appear at ECF 34-1, ECF 34-3, ECF 34-5 to ECF 34-7, ECF 36-1, and ECF 36-2.[4]

_____

20-3624, 2021 WL 5840956, at *16 (D. Md. Dec. 9, 2021). It "has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.'" *Frey v. Comptroller of Treasury*, 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Attorney Gen. of Maryland v. Waldron*, 289 Md. 683, 704, 426 A.2d 929, 941 (1981)).

Article 26 of the Maryland Declaration of Rights is construed *in pari materia* with the Fourth Amendment. *Muse v. State*, 146 Md. App. 395, 401 n.7, 807 A.2d 113, 117 n.7 (2002); *see also Stutzman v. Krenik*, 350 F. Supp. 3d 366, 377 (D. Md. 2018); *Upshur v. State*, 208 Md. App. 383, 397, 56 A.3d 620, 628 (2012), *cert. denied*, 430 Md. 646, 62 A.3d 732 (2013).

Article 40 of the Maryland Declaration of Rights is Maryland's constitutional counterpart to the provisions for freedom of speech and freedom of the press contained in the First Amendment. Courts ordinarily "need not consider Article 40 and the First Amendment separately as Article 40 is read generally *in pari materia* with the First Amendment." *Nefedro v. Montgomery Cnty.*, 414 Md. 585, 593 n.5, 996 A.2d 850, 855 n.5 (2010).

[4] The exhibits filed under seal are merely referenced at cites associated with ECF 15, but are not publicly available at those cites. Instead, if filed under seal, they are found at cites associated with ECF 14.

By Memorandum and Order dated September 15, 2023, and docketed on September 18, 2023 (ECF 32, ECF 33), I granted in part and denied in part defendants' motion to seal (ECF 14) certain exhibits. I also directed defendants to "file redacted versions of ECF 14-6 to ECF 14-12, striking all names and personal identifying information . . . ." ECF 32 at 7. Accordingly, redacted

Plaintiffs oppose the Motion (ECF 21, the "Opposition"), supported by five exhibits. ECF 21-2 to ECF 21-6. They filed all but one exhibit under seal. *See* ECF 22-2 to ECF 22-4; ECF 23 to ECF 25.[5] Defendants replied. ECF 31 (the "Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.[6]

---

versions of ECF 14-6 to ECF 14-12 appear at ECF 34-1, ECF 34-3, ECF 34-5 to ECF 34-7, ECF 36-1, and ECF 36-2.

[5] Plaintiffs also moved to seal their exhibits. ECF 22. Defendants did not respond to that motion. On March 7, 2023, I granted plaintiffs' motion to seal, "subject to further order of the Court." ECF 28. It is not necessary for me to revisit that ruling.

[6] In Counts VI through IX of the Amended Complaint, plaintiffs baldly assert, without any supporting facts, that defendants engaged in "a policy, pattern, and/or practice of inaction" that harmed plaintiffs. ECF 2, ¶ 167; *see also id.* ¶¶ 169, 183, 185, 199, 215. Defendants do not address the assertion in the Motion, and plaintiffs only mention it sparingly in their Opposition. ECF 21 at 55–56.

A pattern and practice claim generally pertains to *Monell v. Department of Social Services,* 436 U.S. 658 (1978), in which the Supreme Court determined that a local governmental body may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government, resulting in a violation of the plaintiff's rights. *Id.* at 690–91. A viable *Monell* claim consists of two components: 1) an unconstitutional policy or custom of the municipality; 2) and the unconstitutional policy or custom caused a violation of the plaintiff's rights. *See, e.g., Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Washington v. Hous. Auth. of the City of Colum.*, 58 F.4th 170, 177 (4th Cir. 2023); *Kirby v. City of Elizabeth City*, 388 F.3d 446, 451 (4th Cir. 2004); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

In *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015), the Fourth Circuit reiterated that to establish a *Monell* claim based on custom and practice, the plaintiff "must point to a 'persistent and widespread practice[ ] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1386–91 (4th Cir. 1987)) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead . . . the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

## I. Factual Summary[7]

### A. The Amended Complaint[8]

At the relevant time, K.H. was thirteen years of age and in the ninth grade at SPHS.  ECF 2, ¶¶ 18, 19.  She is "originally from Great Britain and recently became a student" at the School.  *Id.* ¶ 21.  According to plaintiffs, the School has between 1,750 and 1,950 students.  ECF 21 at 20.  And, plaintiffs assert that, at the time of the incident, K.H. was one of the youngest students at the School.  ECF 34-3 at 1.

---

If plaintiffs are attempting to raise a *Monell* claim, the allegations are woefully deficient, as no facts are presented to support the claim.  Nor have the parties briefed such a claim.  Therefore, I have assumed that plaintiffs did not intend to lodge a *Monell* claim.  And, I do not address *Monell*.

[7] In the Memorandum Opinion, I cite to the electronic pagination of various submissions.  However, the electronic pagination does not always correspond to the page number imprinted on a given document.

[8] The summary of facts derives from the allegations in the Amended Complaint as well as certain exhibits integral to it.  *See, e.g.*, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (a court may properly consider documents that are "explicitly incorporated into the complaint by reference . . . .").  Defendants paint a picture of the facts at odds with the allegations in the suit.  However, as discussed, *infra*, at this juncture the Court must assume the truth of plaintiffs' factual allegations.  *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

To illustrate the parties' differing factual accounts, I note that defendants contend that K.H. painted her face "brown," ECF 15-1 at 5, but plaintiffs allege that K.H. used gold face paint.  *See, e.g.*, ECF 2, ¶¶ 46, 49, 50, 71, 86.  Defendants also discuss facts that ostensibly were not pertinent to the School's decision to suspend K.H., such as her alleged "habit and reputation of engaging in questionable and/or insensitive behavior . . . ."  ECF 15-1 at 5.  Moreover, they suggest that disciplinary action was necessary to address "a hostile school environment" created by K.H., *id.* at 3–4, and to mollify the "'hundreds' of students" who were irate or offended by K.H.'s action.  *Id.* at 5; *see also* ECF 31 at 10.  However, plaintiffs maintain that K.H. did not cause a disturbance at School.  ECF 2, ¶ 50; ECF 21 at 20, 24.

Defendants also characterize the Student as being "braggadocios [sic] about her actions and the lawsuit that has been filed on her behalf."  ECF 15-1 at 27.  But, this assertion is plainly irrelevant as a basis to justify the defendants' decision, made months earlier, to suspend K.H.

On Friday, October 15, 2021, K.H. and her friends attended an SPHS football game, and "they all wore face paint . . . " in School colors.  ECF 2, ¶ 30.  The School's colors are blue and gold.  *Id.* ¶ 24.  K.H.'s mother purchased the gold face paint for K.H. "to use at the Football Game." *Id*. ¶ 27.

The suit contains a redacted photograph of K.H. and four of her friends, all wearing face paint.  *Id.* ¶ 31.  It also includes a photograph of the "Face Makeup" that Ms. Heward purchased. *Id*. ¶¶ 28, 29.

The day after the football game, Saturday, October 16, 2021, K.H. was planning "to host a sleepover with her friends at her house."  *Id.* ¶ 40.  While at home, *id.* ¶ 41, K.H. "decided to make a private 'FaceTime' phone call to one of her friends . . . ." *Id*. ¶ 45.  The friend "is a member of a minority group . . . ."  *Id.* ¶ 53.  During the phone call, K.H. "decided to use the remaining gold face paint to paint a skeleton on her face in the spirit of the upcoming Halloween holiday." *Id.*  ¶ 46.  However, "before she finished," she "messed up the skeleton."  *Id.* ¶ 47.  So, K.H. "then decided just to cover her face and neck with the remaining gold paint."  *Id.* ¶ 48.[9]

Then, K.H. took a photo of herself (the "Snap" or the "School Spirit Snap")[10] and sent it to her friends.  *Id.* ¶¶ 49, 50.  The Amended Complaint states, *id*.:

49.      Before Student Doe could finish painting her face and neck gold, while still on FaceTime, Student Doe took a 'silly selfie' picture and decided to send it to a private, closed group of immediate friends (approximately eight (8) close friends, many of who are of minority groups and were attending a sleepover at Student Doe's house later that night) (the "Snapchat Group") using the Snapchat app,

---

[9] Defendants contend that K.H. painted her face with a mixture of gold and brown paint. ECF 15-1 at 18.  As noted, plaintiffs allege that the color was gold.  ECF 2, ¶ 50; ECF 21 at 20, 24.

[10] Plaintiffs have labeled the photo the "School Spirit Snap."  Defendants do not approve of that terminology.  ECF 15-1 at 18 n.10.  In general, I shall refer to the photo as the "Snap." However, when quoting from the Amended Complaint, I shall, of course, use plaintiffs' terminology.

without any amplifying commentary or remarks (the "School Spirit Snap").  In fact, there was no wording or remarks put on the photo.

50.     During the School Spirit Snap, Student Doe's face was covered with gold face paint, and she held up the "rock out" sign with her free hand.

Plaintiffs explain that the "'rock out' sign" is "commonly used in Heavy Metal culture . . . ."  *Id.* ¶ 51.  Further, they assert that the sign is rooted in "ancient religions . . . to ward off demons or evil spirits."  *Id.*

At the time that K.H. took the Snap and sent it to her friends, it was a Saturday, and K.H. was in the privacy of her home.  *Id.* ¶¶ 40, 41.  Notably, K.H. was not participating in a School activity.  *Id.* ¶ 43.  Nor did she mention any School personnel, students at the School, or use the School's logo.  *Id.* ¶ 55.  Moreover, she did not use any School resources to create or transmit the Snap.  *Id.* ¶¶ 54, 59.  And, the Snap was "not accessible to the general public."  *Id*. ¶ 56.  As noted, the Snapchat Group, to whom K.H. sent the Snap, consisted of eight "close friends," *id.* ¶ 49, some of whom are students of color.  ECF 2, ¶¶ 49, 53, 62.

As planned, on the evening of Saturday, October 16, 2021, K.H. hosted a sleepover "with most of the members from the Snapchat Group."  *Id*. ¶ 62.  Some of the guests are "members of minority groups," and no one mentioned being offended by the Snap.  *Id*.  The friends remained at K.H.'s house until the early evening on Sunday.  *Id.* ¶ 63.

According to the Amended Complaint, "Snap Chat deletes 'Snaps' (which are the photos taken on the Snapchat platform) from the platform after twenty-four (24) hours, so the School Spirit Snap disappeared from Snapchat the next day, which was Sunday, October 17, 2021, a non-school day."  *Id*. ¶ 57.  However, before the Snap was automatically deleted, "a fellow student from the private Snapchat Group took a screenshot of the School Spirit Snap and shared it with

other students outside of Student Doe's friend group, without Student Doe's knowledge, permission, intent and/or consent." *Id.* ¶ 61.

On Monday, October 18, 2021, the "Snap was brought to the attention of" School officials, *id.* ¶ 65, by a student who "was not from the immediate, private Snapchat Group." *Id.* ¶ 66. The complaining student asserted that the Snap depicted K.H. in "'brown face' and/or 'black face.'" *Id.* ¶ 67.

During K.H.'s second period class, she was "pulled" from her class by unidentified "Agents" of the Board and "questioned about the contents of her" Snap. *Id.* ¶ 70.[11] According to plaintiffs, K.H. "told [the] Board" that the Snap "was taken with **gold** face paint and [she] had absolutely no intention to offend or harm anyone." *Id.* ¶ 71 (emphasis in original). The Amended Complaint does not identify the persons with whom K.H. spoke. Plaintiffs also assert that the friend with whom K.H. was "Facetiming" at the time K.H. applied the face paint "confirmed the lack of any racial bias or intent on the part of Student Doe," explaining that the two "were just messing around with their makeup." *Id.* ¶ 75.

Nevertheless, K.H. was sent home from School on Monday, October 18, 2021. *Id.* ¶ 76; *see also* ECF 15-1 at 24–25. According to plaintiffs, the School had only learned of the occurrence that morning. ECF 2, ¶ 65. That same day, the School called plaintiffs to inform them of K.H.'s suspension. ECF 15-1 at 24.[12]

Also on October 18, 2021, the School issued a letter addressed to plaintiffs (the "Suspension Letter", ECF 34-1), signed by Bathras and Chang. The Suspension Letter advised

---

[11] The Amended Complaint does not specify the time of second period. But, presumably, second period is early in the School day.

[12] Plaintiffs do not specify either the time that K.H. was sent home or the time that the School called plaintiffs.

that K.H. "has been placed on short-term suspension for two (2) days from school for violation of

Board of Education Policy of Anne Arundel County Public Schools JCC-Student Conduct -JCC-

JO-RA Bias Motivated Behavior and Misuse of Social Media."[13]  *Id.* at 1.[14]   The suspension was

to begin on Tuesday, October 19, 2021, and continue through Wednesday, October 20, 2021.  *Id.*[15]

Further, the Suspension Letter states, *id.*:

> [K.H.] posted an offensive picture via SnapChat of her face painted in brown paint
> with a stick figure drawn on her neck.  She sent the picture to a group of her SPHS
> peers, which included two students of color.  This incident also caused a major
> disruption to the normal operations of the school day for students and staff.[16]

Mr. Heward prepared an appeal on October 20, 2021, addressed to Bathras.  ECF 34-3.

K.H. delivered the appeal to Bathras on October 21, 2021.  ECF 36-1 at 2.[17]  Mr. Heward explained

that K.H. used gold makeup purchased by her mother "to wear in support of the Varsity Football

Team during their recent match."  ECF 34-3 at 1.  He claimed that they still had the packaging for

---

[13] The labels for the Board's policies and regulations, *e.g.*, "JO-RA," are rather unusual
and certainly confusing.

[14] According to a recent news report, "[t]he Anne Arundel County Board of Education filed
a lawsuit . . . against social media groups Meta, Google, ByteDance and Snap Inc., alleging that
their social media platforms have contributed to a growing mental health crisis among the system's
85,000 students."  Megan Loock, *Anne Arundel School Board Joins Lawsuit Against Social Media
Companies, Alleging a Role in Youth Mental Health Crisis*, CAPITAL GAZETTE (Sept. 5, 2023, 5:23
p.m.), at  https://perma.cc/DH62-7N7M.   The news report also states: "The school system is
seeking unspecified monetary damages in an effort to 'address this decline in students' mental,
emotional and social health.'"  *Id.*; *see* F.R.E. 201.

[15] Although the Suspension Letter is dated October 18, 2021, plaintiffs assert that they did
not receive it until October 20, 2021, at "the very end of [K.H.]'s suspension."  ECF 34-3 at 3.

[16] As noted, plaintiffs dispute that School was disrupted.  ECF 2, ¶ 50; ECF 21 at 20, 24.
They assert that just ten of nearly 2,000 students wrote statements about the incident, and only six
of those originated from students outside of the original Snapchat Group.  ECF 21 at 20. Plaintiffs
also contend that one of the six students "had previously bullied and assaulted Student Doe."  *Id.*
at 21.

[17] ECF 34-5 and ECF 36-1 appear to be the same document.

the face paint.  *Id.*  Mr. Heward also emphasized that Student Doe is just "13 years old," is "one of the youngest at [SPHS]," and "with her British education to date, she is not as culturally familiar with the immediate social and political sensitivities associated with ethnicity in the US."  *Id.*

Further, Mr. Heward indicated that K.H. "was at home on a weekend and decided to play with makeup, whilst on-line with a friend using the Facetime app," that the friend is "of an ethnic minority background within the US," and "there was no discussion of this being a racially motivated or insulting act."  *Id.*  He also stated that, "[a]s has been accepted and agreed by Ms[.] Chang, there was **no intent of bias** by [K.H.]'s experimentation with gold face paint," and the Snap was instead "an impulsive, creative expression and not meant to insult."  *Id.* at 2 (emphasis in original).  Moreover, Mr. Heward insisted that K.H.'s conduct did not meet the Board's policy's standard of being an "intentional" act, as K.H. never intended to harm anyone.  *Id.* at 1–2.

In addition, Mr. Heward indicated that the students who disseminated the photo should be "equally disciplined," because "[t]heir intent of sharing has been to punish [K.H.] psychologically by creating an environment in which she is being ostracised [sic] and which could undoubtedly lead to bullying and persecution."  *Id.* at 2.[18]  Drawing on the Student Handbook's alternative punishment policies, Mr. Heward observed that there were other avenues available to the School that could have been used for "education, support and discussion to build understanding."  *Id.* Instead, according to Mr. Heward, the School's suspension of K.H. "reinforced the attitudes of others that [K.H.] intentionally demonstrated hostile bias."  *Id.* at 3.

---

[18] Mr. Heward suggested that the disruption at School, if any, was caused by the conduct of the student who took the screenshot and the student or students who then disseminated the Snap, without K.H.'s permission.  There is no indication that the School disciplined the student or students who publicized the Snap.

Mr. Heward also objected to the School's "misrepresentation" that K.H. "intentionally caused biased harm," and the "damage to [K.H.]'s personal reputation," her friendships, and her psychological well-being caused by the "drastic" disciplinary measures.  *Id.*  He stated that he "trust[s] that [K.H.] will be afforded the proper support and counselling, that ensures misguided, retaliatory acts of bullying against a clearly misunderstood situation, are robustly dealt with noting again, that [K.H.] has already been subject to recorded, physical violence whilst at Severna Park High."  *Id.*

On October 22, 2021, Bathras sent an email to Mr. Heward, informing him that he received the appeal.  ECF 36-1 at 2.  Bathras confirmed that he would "review this matter in its entirety" and "provide [Mr. Heward] with a written (email) response within 10 school days (from 10-21-21)."  *Id.*

Bathras wrote to Mr. Heward on November 2, 2021, via email, with a copy to Chang, denying Mr. Heward's appeal.  ECF 36-2.  Bathras explained: "The original complaint was made by a group of SPHS students to SPHS administration, which rightfully warranted an investigation into the matter."  *Id.* at 1.  He also said, *id.*: "To honor due process with such matters, Mrs. Chang (the Principal's Designee in this matter) began her investigation on Monday, October 18, 2021, the first school day following the weekend in which the original picture (pic) was posted on social media, after the complaint was received at the schoolhouse."  Further, Bathras asserted, *id.*: "Due process was given to [K.H.] in this matter. . . ."

According to Bathras, the investigation "showed that two SPHS students of color in [K.H.]'s peer group did receive (were sent by [K.H.]) the attached pic via Snapchat on the evening of Saturday, October 16, 2021."  *Id.*  He claimed that these students "did express in both verbal and written statements that the pic was 'offensive,'" with one even telling Student Doe that it was

offensive "in a private message immediately." *Id.*  Citing the Student Handbook's definition of bias behavior, Bathras stated that the act of sending the Snap was sufficient to meet the "intentional electronic communication" standard and that the Snap "did *'substantially interfere with a student's...psychological wellbeing.'*" *Id.* at 1–2 (italics and ellipses in original).

Moreover, Bathras asserted that when Chang informed Ms. Heward verbally of Student Doe's suspension on October 18, 2021, "due process was followed," because "Mrs. [Heward] was told of the allegations, investigation, and final discipline action for [K.H.]" and the "suspension letter only formalized it in writing." *Id.* at 5.  He also maintained that his decision to suspend K.H. and require her attendance at the Bias Behavior and Language Program "was not a *'rash disciplinary act,'* nor was it taken *'without a full, clear view of the whole situation or its context.'*" *Id.* at 6 (emphasis in original).  And, he claimed that "none of this was arbitrary nor capricious," because "Mrs. Chang did a thorough investigation into this matter, and she has communicated with [Mr. Heward] on many occasions since the start of this incident, and many times after the incident." ECF 36-2 at 5.

Notably, Bathras disagreed that K.H. "did not '*intentionally*' send the pic to cause harm or to be bias-motivated." *Id.* (emphasis in original).  He noted that "[K.H.] admits to posting the pic . . . to the group which constitutes intentional electronic communication." *Id.*  He added that "the communication created a hostile educational environment because the post was perceived as being offensive by students of color who attend SPHS and created a disturbance of the normal operation of school." *Id.*  Thus, he said: "SPHS believes that [K.H.] did intend to make fun and offend." *Id.*

In support of his position, Bathras noted that, by K.H.'s own admission, the paint was "gold/brown." *Id.*  And, he pointed out that "a stick figure [was] painted on [K.H.'s] neck,"

indicative "of a full figure person." *Id.* He also claimed that the face paint was not used to show school spirit, because, among other things, it was used "two weeks after Homecoming," *id.*, and the Homecoming pep rally. *Id.* at 2–3. Bathras added that K.H. never indicated that she wore the face paint to express School spirit, nor did any witness support such an assertion. *Id.* at 2. And, he said, even students who wear face paint for school spirit use only "small amounts of paint color . . . ." *Id.*

Bathras referred to a proposed revised suspension letter that apparently had been discussed. *Id.* at 3–4. But, unhappy with Mr. Heward's unwillingness to recognize K.H.'s misconduct, he revoked the offer. *Id.* at 3. Bathras said, *id.*: "Once the offer was made to you for a revised suspension letter statement, you then attempted to turn the words and situation to give the appearance that SPHS administration believes the contrary." He also said, *id.*: "The more you communicate with SPHS, the more I see how both [K.H.] and you are going farther away from accountability." He added, *id.* at 3: "[A] revised suspension letter is not on the table unless there is a definitive mutual understanding and agreement that you will not use [it] as leverage to make inaccurate claims against our findings . . . ."

Further, Bathras asserted, *id.*: "SPHS administration believes based on our investigation, that [K.H.] did intentionally post/send the pic to her group of peers, knowing it could be construed as offensive and make fun." *Id.* And, Bathras stated: "It is also not your or [K.H.]'s determination of what is to be perceived by the students of color regarding what they find offensive." *Id.* at 2; *see also id.* at 4.

Bathras also discussed as an apparent ground for suspension alleged prior misconduct by K.H., even though the suspension had ostensibly been based only on the Snap. He stated that the "investigation showed that the same group of peers had told [K.H.] previously (prior to this

incident) that [she] sometimes says jokes or other comments that are racially offensive or can be construed as offensive, specifically to the students of color in the group of peers that were directly involved in this incident." *Id.* at 4.

In addition, Bathras addressed Mr. Heward's concern for the safety of his daughter. Bathras said, *id.* at 6:

> My (and Mrs. Chang's) compassion and empathy first go out to the students of color and their parents in this specific instance.  In working with and after speaking with the latter students and parents, we then turn our attention to [K.H.].

In his decision to deny the appeal, Bathras also made the following comments, *id.* at 3, 5, 6 (italics in original, bold added):

- Many parents become concerned with the permanent record and how this incident may/may not affect a student's future post-secondary pursuits. First, any incident such as this is self-reported by student on a college application if asked (every college is different in what they ask students about their discipline record); SPHS does not proactively report any incident(s) to colleges.  If asked by a college, it is our experience that they want to see it was a one-time incident, no patterns of misbehavior, **and most importantly the student (and parent) took ownership; that they took accountability and used it as a "teachable moment," not that the student and parent are deflecting, turning the incident on self as the victim, or not moving forward in a positive direction**.[19]

- In your appeal letter, you state [K.H.] "*with her British education to date, she is not as culturally familiar with the immediate social and political sensitivities associated with ethnicity in the U.S.*"  **With all due respect, I recommend you work with [K.H.] (as the school and school system is currently doing with all students) on the latter to bring her up to speed as best and as quick as possible** so as not to have her make future mistakes in her judgment regarding her actions and/or language.

- I respect your 20 years serving as a Commissioned Officer in the Royal Navy, for my father was a US Army (and Marines) retired veteran himself. **As someone in a leadership role like you, who oversees similar matters regarding diversity, I hope you would agree in these instances, it is not**

---

[19] It is perhaps ironic that an educator suggested to plaintiffs that they should turn the experience into a "teachable" moment for K.H.

**my place to tell a victim (a student of color and their parents) that their "*perception*" or how they received such an act is not offensive to them.** As you state, you have "*encountered numerous situations*," so I respectfully encourage you to share such instances with [K.H.] (so as not to breach confidentiality in the matters), rather **to create proactive teachable moments** for [K.H.].  As you know, as parents, we constantly work on finding ways to help our children grow and develop and often give them proactive advice as best we can to mitigate any unforeseen and unfortunate circumstances they may encounter.

In sum, Bathras concluded, ECF 36-2 at 6:

After careful and thorough review of this matter, reviewing all the relevant information, I find that Mrs. Chang's investigation was thorough, accurate, and the final decision of an out-of-school suspension was warranted based on the information (which was found and reviewed) in relation to this incident.  I uphold my original decision of an out-of-school suspension and [K.H.'s] enrollment/attendance in the AACPS Bias Behavior and Language Program for [K.H.].  I am confident [K.H.] will move forward this 2021-2022 school year using this as a very important and meaningful "teachable moment" in her life.  I would hope you support the latter.

Mr. Heward emailed Bathras on November 2, 2021, acknowledging his receipt of the disposition of the appeal.  ECF 34-6 at 3.  Then, on November 9, 2021, Mr. Heward emailed Bathras, stating, *id.* at 2: "In review of your response to our Level 1 appeal and the ongoing issues with cyber and verbal bullying against [K.H.], I feel strongly that this situation has been mismanaged and that the assertion of this being a case of intentional bias and intentional misuse of electronic communication is misfounded."  Mr. Heward attached an appeal to "Regional Assistant Superintendent Ms[.] J[.] Robinson through [Bathras's] office. . . ."  *Id.*  In response, Bathras told Mr. Heward to email his appeal to Robinson, *id.* at 1, and Mr. Heward did so.  ECF 2, ¶ 97.

In a determination of November 16, 2021, transmitted via email to Mr. Heward, Robinson upheld Bathras's decision.  ECF 34-7.  Robinson stated, *id.*: "My investigation included a review of all documents shared by both you and [SPHS] . . . .  Based on my review, I find that [K.H.]

15

intentionally sent the Snapchat that offended other Severna Park High School students."  She explained her belief that K.H.'s participation in the bias education program "will help [K.H.] understand that while she may not have *intended* to offend her peers, the intentional act of sharing the photo of her painted face on social media adversely impacted others and caused a disruption to the school."  *Id.* (emphasis in original).

Accordingly, Robinson denied Mr. Heward's request for "[r]emoval of any record or reference to intentional bias or intentional misuse of electronic communication from [K.H.'s] education record" and his request that K.H. not have to attend the bias training.  *Id.*  In response to Mr. Heward's "concerns about [K.H.] feeling vilified and bullied," she directed Mr. Heward to "talk with [K.H.] about reporting any such instances immediately to her counselor or administrator to take prompt action."  *Id.*  And, she noted that Mr. Heward could appeal the decision to Dr. Dawn Lucarelli, Associate Superintendent.  *Id.*[20]

In summary, plaintiffs insist that "the color on [the Student]'s face was gold and not brown or black . . . ."  ECF 2, ¶ 86.  Therefore, they contend that defendants "misrepresented that the photograph was 'brown' face, not gold face."  *Id.* ¶ 82.

Further, plaintiffs assert: "Student Doe was irrationally and negligently suspended from [SPHS] for displaying 'intentional' bias – despite no evidence supporting the suspension or finding of 'intentional' bias."  *Id.* ¶ 76.  In their view, defendants acted based upon "unsupported accusations from someone outside Student Doe's friend group, who came into possession" of the Snap without K.H.'s consent.  *Id.* ¶ 77.

Additionally, plaintiffs complain that defendants "attached the label of bias, racial bias, and racist to Student Doe" even though she "had no intent to cause any harm to any student or any

---

[20] The suit does not provide information as to whether plaintiffs pursued that appeal.

other person, and was, in fact, wearing gold paint on her face outside School hours, in her private home, in a private conversation, that was shared without her consent, did not involve any School property, and did not mention the School." *Id.* ¶ 84.  In their view, K.H. has been unfairly "labeled" a "racist" because of defendants' conduct.  *Id.* ¶ 91; *see id.* ¶ 92.

Moreover, plaintiffs assert that both K.H. and Mr. Heward "made repeated requests" to the Board to "reconsider the terms of Student Doe's suspension, initiating conversations with the Principal, Assistant Principal, and the Regional Assistant Superintendent for Glen Burnie and [SPHS] (as identified above, Defendant Chang, Defendant Bathras, and Defendant Robinson)." *Id.* ¶ 85.  Nonetheless, the "Board held firm to its decision to suspend Student Doe" and "added a note regarding the incident to her permanent student file." *Id.* ¶ 86.

Plaintiffs also challenge the School's decision that "required" K.H. "to participate in the Bias Behavior Program." *Id.* ¶ 87.  They contend that "[t]his requirement by Defendant Board gave the impression to students and others that Student Doe's behavior was biased towards a racial/minority/ethnic group and/or intending to cause offense to a certain group of people." *Id.*

Further, plaintiffs point out that the "Snap was intended to disappear before School started on Monday, October 18, 2021." *Id.* ¶ 77.  And, plaintiffs allege, *id.* ¶ 81:

> Defendant Board "rubber stamped" the complaint against Student Doe without regard to (a) Student Doe's safety, (b) Student Doe's physical, mental, emotional, and psychological well-being, (c) the truth of the circumstances, and (d) a plan for Student Doe's successful re-entry into Severna Park High School.

In this regard, plaintiffs allege that after K.H.'s suspension, she "was subjected to cyberbullying, in-person bullying, and exclusion from her friend groups." *Id.* ¶ 91; *see also id.* ¶ 88.  Yet, they assert that the Board has taken no steps to ensure K.H.'s safety.  *Id.* ¶ 92; *see* ECF 36-2 at 6 (containing a statement from Bathras to Mr. Heward stating that, "[i]n working with and after speaking with the latter students and parents, we then turn our attention to [K.H.]").

The Hewards also contend that the suspension "will have a negative effect on [the Student's] future college application process as colleges look through previous school transcripts looking for discrepancies such as suspensions or negative behavior exhibited by the applicant." ECF 2, ¶ 96.  And, they complain that the Board has refused to remove the incident from the Student's record.  *Id*. ¶ 97.

Plaintiffs acknowledge that, "[a]t all relevant times, the employees of the School System and the Board, including [the] Individual Defendants, were acting within the scope of their employment in all matters relating to Student Doe, which included, but was not limited to, instructing Student Doe and supervising Student Doe."  *Id.* ¶ 105.  They assert that the Board was not acting *in loco parentis* when K.H. sent the Snap.  *Id*. ¶ 101.  Yet, they also assert that the Board "has a *loco parentis* relationship with its students and has a special duty to protect a student from harm . . . ."  *Id*. ¶ 107.

### B. The Student Handbook, Anne Arundel County Policies, and Anne Arundel County Regulations

In the Amended Complaint, plaintiffs allege that the Board relied on the Anne Arundel County Public Schools Student Handbook (the "Handbook", ECF 15-16) "as its basis for implementing Student Doe's suspension from School."  ECF 2, ¶ 89.  The Amended Complaint includes text from page 29 of the Handbook, defining bias behavior.  *Id.* ¶ 38; *see* ECF 15-16 at 33.  Moreover, the Suspension Letter (ECF 34-1) expressly states that K.H. was suspended "for violation of Board of Education Policy of Anne Arundel County Public Schools JCC-Student Conduct -JCC-JO-RA Bias Motivated Behavior and Misuse of Social Media."  *Id.* at 1.

The Handbook and certain policies and regulations of the Anne Arundel County Public Schools ("AACPS") were submitted as exhibits by defendants.  As discussed, *infra,* because some of the exhibits are incorporated in the suit or integral to it, I may consider them.  Alternatively, the

Court may take judicial notice of the Handbook as well as the Board's policies and regulations. Therefore, I turn to review those exhibits.

The Amended Complaint, ECF 2, ¶ 38, includes the following definition of "bias behavior," as contained in the Handbook, ECF 15-16 at 33: "'Bullying and cyberbullying, harassment and intimidation, hazing, and bias behavior and language- **intentional conduct**, including verbal, physical, graphic or written conduct or an **intentional** electronic communication that creates a hostile education environment by substantially interfering with a student's educational benefits, opportunities, or performance, or with a student's physical or psychological wellbeing." (Emphasis in ECF 2, ¶ 38).

The Handbook also defines "Bias Behavior and Language" as follows, ECF 15-16 at 35:

**Bias Behavior and Language**
Intentional conduct, including verbal, physical, graphic or written conduct, or an intentional electronic communication directed towards a person or group of persons that:

> a. Creates a hostile educational environment by substantially interfering with a student's educational benefits, opportunities, or performance, or with a student's physical or psychological well-being;

> b. Is based on an actual or perceived characteristic of a person or a group of persons, including race, color, religion, gender, gender identity, sexual orientation, age, national origin, ethnicity, marital status, disability, or homelessness; and

> c. Occurs on school property, at a school activity or event, or on a school bus; or substantially disrupts the orderly operation of a school regardless of where the incident occurs.

Types of bias include:
- Age Bias
- Disability Bias
- Ethnicity/National Origin Bias
- Gender Bias
- Gender Identity Bias
- Homelessness Bias
- Marital Status Bias

- ▪ Racial/Color Bias
- ▪ Religious Bias
- ▪ Sexual Orientation Bias.

AACPS has adopted policies and regulations on a variety of matters.  Of relevance here, Policy JO is titled "Bias Behavior and Language."  ECF 15-14.  It states, in part, *id.* at 1, ¶ 4: "It is a violation of this policy for an AACPS student to engage in bias behavior or language on AACPS property, on a school bus, at school-sponsored activities, or in any manner that substantially disrupts the orderly operation of a school regardless of where the incident occurs."

The corresponding Regulation, "JO-RA" (ECF 15-15), defines "Bias Behavior and Language" as follows, *id.* at 1–2, § C(1):

> ***Bias Behavior and Language*** – intentional conduct, including verbal, physical, graphic, or written conduct, or an intentional electronic communication directed towards a person or group of persons that:
>
>> a. Creates a hostile educational environment by substantially interfering with a student's educational benefits, opportunities, or performance, or with a student's physical or psychological well-being;
>>
>> b. Is based on an actual or perceived characteristic of a person or a group of persons, including race, color, religion, gender, gender identity, sexual orientation, age, national origin, ethnicity, marital status, disability, or homelessness; and
>>
>> c. Occurs on school property, at a school activity or event, or on a school bus; or
>>
>> d. Substantially disrupts the orderly operation of a school regardless of where the incident occurs.

The Regulation defines "Electronic Communication" as follows, ECF 15-15 at 2, § C(12):

> ***Electronic Communication*** – the act of transmitting any information, data, writing, image, or communication by the use of a computer or any other electronic means, including a communication that involves the use of e-mail, an instant messaging service, an Internet website, a social media application, a network call, a facsimile machine, or any other Internet-based communication tool.

The Regulation also provides, *id.* at 3, § D(1)(c): "If the bias behavior or language constitutes bullying behavior as defined in Regulation JCCA-RA – Bullying[,] Cyberbullying, Harassment, and Intimidation, the student may complete and submit a *Bullying, Harassment, or Intimidation Reporting Form* in accordance with Policy JCCA and Regulation JCCA-RA - Bullying, Cyberbullying, Harassment, and Intimidation or report a complaint to the *AACPS Student Safety Hotline.*"  (Italics in original).  Further, "the principal or the principal's designee shall also complete and submit an electronic *Bullying, Harassment, or Intimidation Reporting Form.*"  *Id.* at 3, ¶ D(1)(d) (italics in original).  No such form was submitted here.  ECF 21 at 5.

Section D(3) of the Regulation is titled "Due Process."  ECF 15-15 at 4.  Section D(3)(a) provides that remedial actions for students who commit acts of bias behavior as well as those who make "false accusations shall be consistently and fairly applied after appropriate investigation has determined that such an offense has occurred."  *Id.* at 4–5.  Moreover, "[a] principal shall take necessary action to ensure that instances of bias behavior and language are addressed promptly, fairly, and effectively."  *Id.* at 5, § D(3)(a)(i).  Further, "the principal or the principal's designee shall make every reasonable effort to contact the parent(s)/guardian(s)" of the student involved in the incident of alleged bias behavior or language, and "[a] follow-up letter to the student's parent(s)/guardian(s) shall be sent by first class mail," *id.* at § D(3)(a)(iii), unless the timing of doing so "impedes prompt, fair, and effective action in addressing an alleged incident of bias behavior or language."  *Id.* § D(3)(a)(v).  And, § D(3)(b) states, *id.*: "The safety and welfare of students impacted by incidents of bias behavior and language are the primary concern of the principal and school staff members."

Regulation JO-RA provides that, for a first offense of bias behavior, the student and her/his parents "must attend and successfully complete the *Bias Motivated Behavior Program* . . . ."  *Id.*

at 5 (emphasis in original).  The program is defined in the Handbook as one "designed to help students and their parents acquire knowledge, skills, and attitudes needed to maintain a safe and tolerant lifestyle."  ECF 15-16 at 35.

In addition, the "Bias Behavior and Language" Regulation, JO-RA, provides for various intervention options and support services that a school can offer a student who exhibits bias behavior.  ECF 15-15 at 6–7.  These include counseling, conflict resolution, peer support groups, targeted supervision, and problem-solving skills, among others.  Based on the allegations, no alternatives to suspension were ever offered to K.H.

The Handbook also outlines the due process rights of students.  *See* ECF 15-16.  It defines "Due Process" to mean that "[a] student facing suspension must be given oral or written notice of the allegations and the opportunity to be heard."  *Id.* at 37.  Further, the Handbook provides, *id.* at 25:

> **Right to Due Process and Appeal**
> When students are alleged to have violated a school regulation, they have the right to certain due process protections.  This means that they are entitled to notice of the allegations against them and the opportunity to respond to the allegations.
> If a student is suspended for 10 or fewer days or believes that an action taken by the school is a violation of policy, the parent may use the student complaint process, Board of Education Policy JCH and Administrative Regulation JCH-RA, to initiate an appeal in writing to the principal who will forward the appeal to the Regional Assistant Superintendent.

As to Social Media, the Handbook states, *id.* at 38 (emphasis added):

> **Misuse of Social Media**
> *Whether on or off school grounds*, the use of social media in a manner that demeans, condemns or berates others, including students and staff, hate crimes, threats, incites violence of any kind, embarrasses, defames, harasses or bullies others, or the wrongful impersonation of another, including students and staff.

The Student Use of Social Media Policy, "JCCC," ECF 15-12, states, in part, *id.* at 1, § C(2) (emphasis added): "AACPS prohibits communications by students over social media that

create a hostile educational environment or substantially interferes with a student's educational benefits, opportunities, performance, or with a student's physical or psychological well-being and is threatening or seriously intimidating; and occurs on school property, at a school activity or event, *whether on or off school grounds*, or on a school bus; or substantially disrupts the orderly operation of a school."

The corresponding Regulation, "JCCC-RA," ECF 15-13, defines "Misuse of Social Media," *id.* at 2, § C(6), as follows (emphasis added):

> ***Misuse of Social Media*** – the use of social media, *whether originating on or off school property*, in a manner that demeans, condemns or berates others, including students and staff, incites violence of any kind, embarrasses, defames, harasses, bullies or wrongfully impersonates others, including students and staff . . . or in any manner that violates the Code of Conduct, Board policies or regulations, or other local, State or federal laws.

Further, the Regulation states, ECF 15-13 at 2, § D(2): "Student misuse of social media which has a negative and/or severe impact on a school learning environment, or risks the safety of staff and students shall be addressed by AACPS under this regulation."  Further, it states in § D(3), *id.*: "[S]tudent misuse of social media off school grounds which has a nexus to, or has an impact on the normal operations of a school, learning environments, or the safety of students or staff, shall be addressed by AACPS under this regulation."

In addition, AACPS has issued policies and regulations regarding "Bullying, Cyberbullying, Harassment, and Intimidation."  ECF 15-10; ECF 15-11.  Notably, however, K.H. was not charged with bullying.  *See* ECF 34-1.

Additional facts are discussed, *infra*.

## II. Standard of Review

### A.

The Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment.  *See* ECF 15.  A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).  Under Rule 12(d), however, a court, in its discretion, may consider matters outside of the pleadings.  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Hous., LLC v. City of Salisbury, Md.*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam).

A court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Hous., LLC*, 672 F. App'x at 222 (citation omitted)  ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'").

(alteration in *Adams*). However, when the movant expressly captions its motion as one for summary judgment "in the alternative," and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2004, April 2022 update). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action" and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

Summary judgment is ordinarily inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2012); *see Shaw v. Foreman,* 59 F.4th 121, 128 (4th Cir. 2023); *Putney v. Likin*, 656 F. App'x 632, 638–39 (4th Cir. 2016) (per curiam); *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for

specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.   Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244–45 (discussing affidavit requirement of former Rule 56(f)).   "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"   *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x 378 (4th Cir. 2013) (per curiam).   A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."   *Strag v. Bd. of Trs., Craven Cmty. College*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874–75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).   But, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant."   *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit acts at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"   *Harrods*, 302 F.3d at 244 (citations omitted).   The Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in

opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit.'" *Harrods*, 302 F.3d at 244 (internal citations omitted).[21]

Here, plaintiffs' counsel has filed an affidavit asserting a need to conduct discovery. *See* ECF 21-2. In particular, through counsel, plaintiffs "request every opportunity to 'discover,' develop, and present admissible evidence demonstrating that a genuine dispute of material fact remains . . . ." *Id.* at 1. Moreover, he asserts, *id.*: "Plaintiffs have not had the opportunity to contradict the evidence presented by Defendants . . . ."

No discovery has taken place. And, it is clear that many facts are in dispute. Therefore, it is not appropriate to construe the Motion as one for summary judgment. As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask." *McCray*, 741 F.3d at 483; *accord Putney*, 656 F. App'x at 639.

Therefore, I shall construe the Motion as one to dismiss. This implicates Rule 12(b)(6).

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir.

---

[21] The appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244. Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature [sic] and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244–45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). And, the nonmoving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature.

2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304–05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir.

28

2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts."  *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).  But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion.  *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"  *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250).

Of relevance here, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing.  *See, e.g.*, *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Glenn v. Wells Fargo Bank, N.A.*, DKC-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not alleged in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

**B.**

The case is before the Court on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). As noted, both sides included exhibits with their submissions.  As a preliminary matter, I must determine which exhibits, if any, are subject to consideration at this stage of the case.

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits"); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger*, 510 F.3d at 450.

But, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167.  Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is

proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor and City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied sub nom.*, *City of Greensboro v. BNT Ad Agency, LLC*, 583 U.S. 1044 (2017); *Kensington Volunteer Fire Dep't*, 684 F.3d at 467.

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted, defendants submitted twenty-eight exhibits with their Motion. *See* ECF 15-2 through 15-29.  Some of them were filed under seal.  *See* ECF 14-1 to ECF 14-13.  And, the redacted versions of ECF 14-6 to ECF 14-12 appear at ECF 34-1, ECF 34-3, ECF 34-5 to ECF 34-7, ECF 36-1, ECF 36-2.

ECF 15-2 to ECF 15-4 are declarations of each individual defendant.  ECF 14-1 (sealing notice at ECF 15-5) is a "Bias-Motivated Behavior and Language Incident Report" dated October 18, 2021, which identifies K.H. as a "Perpetrator."  ECF 15-6 to ECF 15-9 are articles concerning Arizona State University and blackface.

ECF 15-10 to ECF 15-15 are various Board polices and regulations.  As noted, ECF 15-10 and ECF 15-11 are the Board's policy and regulation, respectively, concerning bullying, cyberbullying, harassment, and intimidation.  ECF 15-12 and ECF 15-13 are the Board's policy and regulation concerning student use of social media.  And, ECF 15-14 and ECF 15-15 are the Board's policy and regulation concerning bias behavior and language.

ECF 15-16 is the AACPS Student Handbook for the 2021-22 school year.  ECF 14-2 (sealing notice at ECF 15-17) is a SPHS "Incident Report Form" completed by K.H. on "18/11/2021."[22]  It also contains a screenshot of the Snap.  ECF 14-2 at 3.  ECF 14-3 and ECF 14-

---

[22] This date appears to be in day-month-year format, signifying that it was dated November 18, 2021.  However, based on the facts of the Complaint, the Student was interviewed and suspended on October 18, 2021.

4 (sealing notice at ECF 15-18) and ECF 15-19 appear to be screenshots of the Snap.  ECF 15-19 is redacted to cover the Student's eyes.

ECF 14-5 (sealing notice at ECF 15-20) consists of ten SPHS Incident Report Forms completed by SPHS students concerning the Snap.  Some of the Incident Report Forms contain screenshots of the Snap.  *See* ECF 14-5 at 5, 19, 22, 25.  The exhibit also includes the previously mentioned Incident Report Form prepared by the Student.  ECF 14-5 at 1–2; *see also* ECF 14-2 (sealing notice at ECF 15-17).

ECF 34-1 is the "Suspension Letter" to plaintiffs, dated October 18, 2021.  ECF 36-1 and ECF 34-3 contain email chains between Bathras and Mr. Heward regarding an appeal of the suspension and Mr. Heward's request for use of alternative processes, such as "peer mediation" (ECF 36-1), as well as Mr. Heward's appeal to Bathras (ECF 34-3).  ECF 36-2 and ECF 34-5 contain the "appeal response" from Bathras to Mr. Heward, dated November 2, 2021 (ECF 36-2 at 1–7) and earlier emails between Mr. Heward, Bathras, and Chang (*id.* at 7–18), as well as a copy of Mr. Heward's email found at ECF 36-1.  ECF 34-6 contains an email from Mr. Heward to Bathras dated November 9, 2021, concerning appellate review by Robinson.  And, ECF 34-7 is Robinson's decision, upholding Bathras's determination.

ECF 15-26 is a Maryland State Board of Education opinion on a separate matter.  And, ECF 15-27 and ECF 15-28 contain a link to a news article concerning the instant litigation as well as an email containing a news article relating to the instant litigation.  Finally, ECF 14-13 (sealing notice at ECF 15-29) is an email to Chang from a student who was a senior at SPHS, dated April 1, 2022, containing a photo of K.H. from an unknown date and location.  ECF 14-13 at 1.

Plaintiffs take issue with the Court's consideration of certain defense exhibits.  ECF 21 at 4.  In particular, plaintiffs challenge the authenticity of the Snap photographs at ECF 14-2 at 3

(sealing notice at ECF 15-17); ECF 14-3; ECF 14-4 (sealing notice at ECF 15-18); ECF 14-5 at 5, 19, 22, 25 (sealing notice at ECF 15-20); ECF 15-1 at 22; ECF 15-19.  They assert, among other things, that the photographs are screen shots that are "distorted" because they have been "edited" and "have gone through several lifecycles."  *Id.* at 22.  For example, plaintiffs point to "the variation in lighting and coloring [that] is apparent [when] comparing Exhibit 11A [ECF 14-3] (darker) with Exhibit 11B [ECF 14-4] (lighter)."  *Id.*  Therefore, plaintiffs insist that the photos are not "fair and accurate depictions" of the gold face paint worn by K.H. on October 16, 2021. *Id.*

It is common knowledge that digital photographs can easily be edited, including to alter coloration.  Indeed, the variation in coloring across the various versions of the Snap underscores concerns about their authenticity.  At this juncture, I cannot determine whether the photographs are fair and accurate representations of the Snap.  Accordingly, I will not consider the photographs in resolving the Motion.

The individual defendants submitted declarations.  *See* ECF 15-2 to ECF 15-4.  In their declarations, the defendants contest certain facts alleged by plaintiffs.  But, given the posture of the case, I must credit plaintiffs' account of the events.  Therefore, I decline to consider the declarations at this juncture.

Further, I will not consider the "Bias-Motivated Behavior and Language Incident Report" (ECF 14-1) (sealing notice at ECF 15-5), K.H.'s Incident Report Form (ECF 14-2), or the Incident Report Forms from other students (ECF 14-5) (sealing notices at ECF 15-20).  These documents are not "integral" to the Amended Complaint, nor do they give rise to the legal rights asserted. *Deegan v. Moore*, 16-260, 2017 WL 1194718, at *4 (W.D. Va. Mar. 30, 2017) (declining to consider a school incident report because it was neither integral to the complaint nor uncontested);

*see Goines*, 822 F.3d at 166; *Chesapeake Bay Found.*, 794 F. Supp. 2d at 611; *see also Smith v. Hogan*, 794 F.3d 249, 255 (2d Cir. 2015) (finding that a document with "no independent legal significance to [plaintiff's] claim" was not integral to complaint).  The news articles (ECF 15-6 to ECF 15-9; ECF 15-27 to ECF 15-28); the Maryland State Board of Education opinion (ECF 15-26); and the unrelated email from an SPHS senior with an unauthenticated photo of the Student (ECF 14-13 (sealing notice at ECF 15-29)),[23] are plainly not integral to the suit and will not be considered here.

However, under the principles outlined above, I may consider the Suspension Letter (ECF 34-1) and the documents concerning the appeal of the suspension (ECF 34-3, ECF 34-5 to ECF 34-7, ECF 36-1 to ECF 36-2) because they are integral to the Amended Complaint.  Moreover, I may consider the Board's policies and regulations (ECF 15-10 to ECF 15-15) and the Handbook (ECF 15-16).  As an initial matter, an excerpt from the Handbook is explicitly referenced in the Amended Complaint.  *See* ECF 2, ¶ 38.  Additionally, the Handbook, as well as the Board's policies and regulations, are integral to the suit.  They are also publicly available documents, and therefore I may take judicial notice of them.  *See* F.R.E. 201; *Goldfarb*, 791 F.3d at 508.

Plaintiffs attached five exhibits to their Opposition, most of which are sealed.  ECF 21-2 to ECF 21-6.  Exhibits 1 through 3 are declarations from K.H., Mr. Heward, and Ms. Heward. ECF 22-2 to ECF 22-4 (sealing notices at ECF 21-3 to ECF 21-5); *see also* ECF 23 to ECF 25 (duplicates of ECF 22-2 to ECF 22-4).  Exhibit 4 is an email dated October 1, 2021, from Ms.

---

[23] Defendants attach and discuss ECF 14-13 (sealing notice at ECF 15-29), an unauthenticated photo of K.H., alleged to have been taken on April 1, 2022.  Defendants insinuate that the punishment of K.H. on October 18, 2021, was justified because, "even after being suspended for misconduct, K.H. continues to engage in behavior that disrupts the school environment with actions that create a hostile school environment."  ECF 15-1 at 26–27.  As noted, K.H.'s alleged conduct in April 2022 is plainly irrelevant as a basis to justify the action of the defendants months earlier.

Heward to Chang regarding an incident of October 1, 2021, involving K.H.  ECF 22-5 (sealing notice at ECF 21-6); *see also* ECF 26 (duplicate of ECF 22-5).  Exhibit 5 is a declaration of Mr. Ledyard, plaintiffs' attorney, regarding the need for further discovery.  ECF 21-2.

For the reasons addressed earlier, the declarations of K.H., Mr. Heward, and Ms. Heward, (ECF 22-2 to ECF 22-4 and ECF 23 to ECF 25) may not be considered at this juncture.  Plaintiffs cannot supplement their suit by way of the declarations.  Ms. Heward's email to Chang (ECF 22-5, ECF 26) is not integral to the Amended Complaint, nor does it give rise to the legal rights asserted.  Therefore, it will not be considered.

Ledyard's Declaration (ECF 21-2) addresses the plaintiffs' claim that summary judgment is premature because of the need for further discovery.  I have considered it and agree that the Motion may not be construed as one for summary judgment.

### III. Discussion[24]

### A.  Section 1983

Counts IX and X, which assert violations of the First and Fourteenth Amendments to the Constitution, are lodged pursuant to 42 U.S.C. § 1983.  Therefore, I begin with a review of principles pertinent to § 1983.

Section 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).  Under § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

---

[24] Generally, I address the counts in the suit in the order set forth in the Motion.  I discuss Article 24 and Article 40 of the Maryland Declaration of Rights with their federal counterparts.

by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey*, 526 U.S. at 707.

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed."  *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'"  *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181

(citations and internal quotation marks omitted) ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.").

The doctrine of respondeat superior does not apply in § 1983 cases. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Of import here, "'[i]n a § 1983 suit . . . each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'" *Younger v. Crowder*, 79 F.4th 373, 381 n.12 (4th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 677) (alteration in *Younger*). If a plaintiff has not alleged any personal connection between a defendant and a denial of constitutional rights, the claim against that defendant must fail. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *see also Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (same); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (same).

But, as the Fourth Circuit articulated in *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013), a supervisor may be held liable "for the failings of a subordinate under certain narrow circumstances." Pursuant to § 1983, liability for supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020). This requires a plaintiff to allege, *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994):

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular

39

constitutional injury suffered by the plaintiff. *See also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014).

To qualify as "pervasive," the challenged conduct must be "widespread, or at least . . . used on several different occasions." *Shaw*, 13 F.3d at 799. Therefore, it is insufficient to point "to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence . . . nor can he reasonably be expected to guard against the deliberate [unlawful] acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.* (quoting *Slakan*, 737 F.2d at 373) (alteration inserted). But, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his deliberate indifference or acquiescence to "the constitutionally offensive conduct of his subordinates." *Slakan*, 737 F.2d at 373; *see Shaw*, 13 F.3d at 799.

The Amended Complaint does not make clear whether the individual defendants are sued in their official or personal capacities or both. *See Harvey v. Cline*, JTC-15-14091, 2016 WL 1562950, at *4 (S.D. W.Va. Apr. 18, 2016) ("If a complaint specifically alleges a capacity in which the defendant is being sued, that designation controls."). In their Opposition, however, plaintiffs claim that the individual defendants were sued in their individual capacity. ECF 21 at 30. In any event, "[i]t is not a prerequisite for a plaintiff to state that he is suing a defendant in his or her individual capacity in order to state a cause of action under § 1983." *Harris v. Copeland, C.A.*, GRA-11-02209, WL 4504764, at *5 (D.S.C. Aug. 22, 2013).

However, to the extent that the individual defendants are sued in their official capacities, it is tantamount to a suit against the State. In *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court said: "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no

different from a suit against the State itself." (Internal citation omitted); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984) ("And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief."); *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam) ("The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.").

As such, if the individual defendants were sued in their official capacities, they are not "persons" under 42 U.S.C. § 1983. *See, e.g., Purnell v. Converse*, JMC-21-3202, 2022 WL 17552552, at *10 (D. Md. Dec. 9, 2022); *Rossignol v. Voorhaar*, 321 F. Supp. 2d 642, 650 (D. Md. 2004); *see also Doe #1 v. Montgomery Cnty. Bd. of Educ.*, PJM-21-0356, 2021 WL 6072813, at *8 (D. Md. Dec. 23, 2021) (holding that school officials acting in their official capacities are acting as the State and therefore not "persons" under 42 U.S.C. § 1983); *McIntosh v. Div. of Corr.*, PWG-16-1320, 2017 WL 3412081, at *4 (D. Md. Aug. 7, 2017) (same).

I address, *infra*, the sufficiency of the allegations against the individual defendants.

### B. Sovereign Immunity

Defendants contend that, as to the § 1983 claims in Counts IX and X, they are entitled to the defense of sovereign immunity. ECF 15-1 at 27–29. In particular, they posit that the Board is a State agency, and therefore both the Board and the individual defendants, in their official capacities, are protected by sovereign immunity. *Id.*[25]

In their Opposition, plaintiffs argue that defendants have "waived [their] 11th Amendment immunity" based on their removal of this matter to federal court. ECF 21 at 27. They also claim

---

[25] If the Court were to determine that sovereign immunity applies here, the defendants seek dismissal of the pendent State claims. ECF 15-1 at 27 n.12.

that the State has waived sovereign immunity pursuant to § 5-518 of the Courts and Judicial Proceedings Article ("C.J.") of the Maryland Code (2020 Repl. Vol., 2022 Supp.). *Id.* at 29. Further, they contend that, even if defendants did not waive sovereign immunity, the Board is not a State agency. *Id.* at 27. And, they assert: "Even if this Court finds that the Board is immune from suit, claims against Individual Board Defendants . . . can proceed because they are being sued in their individual capacity." *Id.* at 30.

### 1.   The Contours of Sovereign Immunity

The Eleventh Amendment to the Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.").

The Supreme Court has explained: "Although by its terms the [Eleventh] Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States." *Id.* at 363 (collecting cases); *see Allen v. Cooper*, 589 U.S. ___, 140 S. Ct. 994, 1000 (2020); *Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011); *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000). In *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019), the Fourth Circuit explained that the Supreme Court has "draw[n] upon principles of sovereign immunity" to "construe[] the Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" (quoting *Port Auth. Trans–Hudson*

*Corp. v. Feeney*, 495 U.S. 299, 304 (1990)) (alterations added); *see Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019), *cert. denied*, ___ U.S. ___, 140 S. Ct. 903 (2020); *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 248 (4th Cir. 2012); *see also Quern v. Jordan*, 440 U.S. 332, 345 (1979) ("[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"); *Allen v. Cooper*, 895 F.3d 337, 347 (4th Cir. 2018) ("[A] State must *expressly* consent to suit *in federal court* to waive its immunity under the Eleventh Amendment.") (emphasis in original), *aff'd*, 589 U.S. ___, 140 S. Ct. 994 (2020).

Sovereign immunity is a jurisdictional bar that "'deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 417 (2018); *see also Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021) (recognizing sovereign immunity as a jurisdictional limitation and describing it as "a weighty principle, foundational to our constitutional system"). Thus, in the absence of waiver or a valid congressional abrogation of sovereign immunity, the states enjoy immunity from suits for damages brought in federal court by their own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890). And, a plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014); *Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

Immunity under the Eleventh Amendment bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, sometimes referred to as an "arm of the state." *See Pennhurst*, 465 U.S. at 101–02 ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense*, 926 F.3d at 100; *McCray*, 741 F.3d at 483; *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005). Put another way, immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Lane v. Anderson*, 660 F. App'x 185, 195–96 (4th Cir. 2016) (quoting *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (cleaned up).

"Whether an entity is an arm of the state is ultimately a question of federal law, '[b]ut that federal question can be answered only after considering the provisions of State law that define the agency's character.'" *Oberg*, 745 F.3d at 138 (citation omitted) (alteration in *Oberg*). Four factors are pertinent to the analysis, discussed *infra*. *See Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456, 457–58 (4th Cir. 1987).

Moreover, as noted, the Supreme Court recognized in *Will*, 491 U.S. at 71, that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Id.* (internal citation omitted). Thus, Eleventh Amendment immunity protects "state officials acting in their official capacities from being sued in federal court without their consent." *Murphy v. Commonwealth of Va.*, 2022 WL 17484286, at *1 (4th Cir. Dec. 7, 2022) (per curiam); *see also*

*Pennhurst*, 465 U.S. at 101–02 ("And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief."); *Gordon*, 373 U.S. at 58.

However, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).  Moreover, and of relevance here, personal capacity suits, which seek to impose individual liability on a government official for an action taken under color of State law, are also not barred by the Eleventh Amendment.  *Murphy*, 2022 WL 17484286, at *2.

Although "[t]he bar of the Eleventh Amendment to suit in federal courts extends to States and state officials," it "does not extend to counties and similar municipal corporations."  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977); *see Alden v. Maine*, 527 U.S. 706, 756 (1999) (recognizing that sovereign immunity "does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State"). In other words, Eleventh Amendment immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta*, 822 F.2d at 457 (quoting *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979)).  And, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction."  *Williams*, 929 F.3d at 176 (citing *Hutto*, 773 F.3d at 543).

Notably, "[t]he Eleventh Amendment bar to suit is not absolute."  *Feeney*, 495 U.S. at 304. Therefore, "States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."  *Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012); *see Lapides*, 535 U.S.

at 618 ("A State remains free to waive its Eleventh Amendment immunity from suit in a federal court."); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted).

As to the exceptions to Eleventh Amendment immunity, the Fourth Circuit explained in *Lee-Thomas*, 666 F.3d 244 at 249 (some internal citations omitted):

> First, "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, "the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, "[a] State remains free to waive its Eleventh Amendment immunity from suit in a federal court." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

As indicated, a state may, by statute, waive its Eleventh Amendment immunity. *Id.* at 249; *see Pense*, 926 F.3d at 100 (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996)); *see also Lapides*, 535 U.S. at 618. But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp.*, 473 U.S. at 240; *see Pense*, 926 F.3d at 101. Therefore, a "general waiver" is not sufficient to waive Eleventh Amendment immunity. *Pense*, 926 F.3d at 101.

Under *Atascadero State Hosp.*, 473 U.S. at 239, a court may find that a state has waived its Eleventh Amendment immunity "only where stated 'by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" (Citation omitted; alteration in *Atascadero*); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250–51. In other words, the waiver must be both clear and express. *Feeney*,

495 U.S. at 305; *see Atascadero State Hosp.*, 473 U.S. at 241.  Notably, "a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999); *see Pense*, 926 F.3d at 101.

I turn to State sovereign immunity.  It "bars all claims by private citizens against state governments and their agencies, except where Congress has validly abrogated that immunity or the state has waived it." *Passaro*, 935 F.3d at 247.

The Fourth Circuit has described State sovereign immunity as "'broader'" than Eleventh Amendment immunity. *Williams v. Morgan State Univ.*, 2022 WL 7375983, at *1 (4th Cir. Oct. 19, 2022) (per curiam) ("*Williams II*") (quoting *Williams v. Morgan State Univ.*, 850 F. App'x 172, 174 (4th Cir. 2021) (per curiam) ("*Williams I*")).  In *Williams I*, 850 F. App'x at 174, the Court observed: "While courts often discuss both doctrines under the banner of Eleventh Amendment immunity, 'the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment.'"  (quoting *Alden*, 527 U.S. at 713); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011).

Nevertheless, the principles of Eleventh Amendment immunity and State sovereign immunity are often addressed collectively.  For example, in *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), the Supreme Court stated: "Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Id.* at 39.

The Eleventh Amendment did not create State sovereign immunity.  Indeed, "the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden*, 527 U.S. at 713; *see also Sossamon v.* Texas, 563 U.S. at 284.  The preeminent purpose of State sovereign immunity is to "accord States the dignity that is consistent

with their status as sovereign entities." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).  "In proposing the [Eleventh] Amendment, 'Congress acted not to change but to restore the original constitutional design.'" *Franchise Tax Bd. of Cal. v. Hyatt*, __ U.S.__, 139 S. Ct. 1485, 1496 (2019) (quoting *Alden*, 527 U.S. at 722).

Here, defendants removed the case to federal court.  When a state voluntarily removes a case to federal court, it implicates the distinction between immunity under the terms of the Eleventh Amendment and the "broader" doctrine of State sovereign immunity.  *Williams I*, 850 F. App'x at 174; *see also Sansotta v. Town of Nags Head*, 724 F. 3d 533, 546 (4th Cir. 2013).  The Supreme Court has said that a state waives its Eleventh Amendment immunity when it voluntarily removes a case to federal court.  *Lapides*, 535 U.S. at 619–20; *see Williams*, 850 F. App'x at 174. Therefore, defendants cannot validly claim immunity under the terms of the Eleventh Amendment.

In contrast, "a state does not waive its [State] sovereign immunity by removing a suit to federal court." *Williams I*, 850 F. App'x at 174 (citing *Passaro*, 935 F.3d at 247); *see also Williams II*, 2022 WL 7375983, at *1.  Rather, "a state's removal of a suit to federal court waives [State] sovereign immunity only if the state has consented to suit in its own courts." *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020); *see Passaro*, 935 F.3d at 247.  And, a state must make a "clear statement" in order to waive its sovereign immunity.  *Passaro*, 935 F.3d at 248. Therefore, I turn to Maryland law.

"The doctrine of sovereign immunity has long been recognized as applicable in actions against the State of Maryland and its official representatives." *Stern v. Bd. of Regents, Univ. Sys. of Md.*, 380 Md. 691, 700, 846 A.2d 996, 1001 (2004).  It "is rooted in the common law and 'is firmly embedded in the law of Maryland.'" *Id.* (citation omitted).  The doctrine "precludes suit against governmental entities absent the State's consent." *ARA Health Servs., Inc. v. Dep't of*

*Public Safety & Corr. Servs.*, 344 Md. 85, 91–92, 685 A.2d 435 (1996); *see State v. Sharafeldin*, 382 Md. 129, 140, 854 A.2d 1208, 1214 (2004) (explaining that "the origin of the doctrine of sovereign immunity in Maryland did not stem from judicial fiat but was statutory in nature, and '[w]e have consistently declined to abrogate sovereign immunity by judicial fiat'" (citation omitted) (alteration in original)).

The Maryland Court of Appeals[26] has "held, consistently, that immunity from suit is 'one of the highest attributes of sovereignty,' and that any waiver of that immunity must come from the Legislature." *Sharafeldin*, 382 Md. at 140, 854 A.2d at 1214 (citation omitted). Moreover, Maryland courts "construe legislative dilution of governmental immunity narrowly in order to avoid weakening the doctrine of sovereign immunity by judicial fiat." *Stern*, 380 Md. at 720, 846 A.2d at 1012–13. The Maryland Court of Appeals has said: "When considering waivers of sovereign immunity, this Court and the Court of Special Appeals have strictly construed such waivers in favor of the sovereign." *Bd. of Educ. of Balt. Cnty. v. Zimmer-Rubert*, 409 Md. 200, 212, 973 A.2d 233, 240 (2009).

### 2. Sovereign Immunity as to the Board

As indicated, defendants contend that the Board is a State agency.  ECF 15-1 at 27.  And, as a state agency or instrumentality that functions as an "arm of the State," defendants argue that

---

[26] In Maryland's general election of November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  And, the voters also approved changing the name of the Maryland Court of Special Appeals to the Appellate Court of Maryland.  These changes went into effect on December 14, 2022.  *See* Press Release, *Voter-Approved Constitutional Change Renames High Courts to Supreme and Appellate Court of Maryland*, MARYLAND COURTS (Dec. 14, 2022), https://perma.cc/K87C-UUCG.

To avoid confusion, I will refer to the Maryland courts by the names that were in effect when the cited cases were decided.

the Board is entitled to invoke sovereign immunity.  *See Regents of the Univ. of Cal.*, 519 U.S. at 429; *Condon v. State*, 332 Md. 481, 492, 632 A.2d 753 (1993).

Plaintiffs counter that, under the factors outlined in *Lane*, 660 Fed. App'x at 195–96, reiterated in *Proctor v. Wells Fargo Bank, NA*, 289 F. Supp. 3d 676, 687–88 (D. Md. 2018), the Board is not a State agency.  *See* ECF 21 at 27–28.  And, they argue that this Court should not "adhere to wrongly decided precedence [sic] or *stare decisis*," because "[w]e should not engage in 'the art of methodically ignoring what everyone knows to be true.'"  *Id.* at 29.  In addition, they assert "'that the Board may not raise the defense of sovereign immunity in regard to *any claim* of $[4]00,000 or less.'"  *Id.* at 30 (quoting *Norville v. Board of Education*, 160 Md. App. 12, 28, 862 A.2d 477, 508 (2004) (emphasis in original), *vacated on other grounds*, 390 Md. 93, 887 A.2d 1029 (2005).[27]

As discussed, defendants voluntarily chose to remove this case from State court to federal court.  In doing so, they have waived Eleventh Amendment immunity.  *See*, *e.g.*, *Williams I*, 850 F. App'x at 174.  Therefore, the Board is not entitled to immunity under the Eleventh Amendment. Nevertheless, I must still consider whether the Board is entitled to State sovereign immunity.  In particular, I must first determine whether the Board qualifies as an arm or instrumentality of the State, entitled to the protections of State sovereign immunity or, instead, is to be regarded as a county agency, to which State sovereign immunity does not apply.  And, if the Board qualifies as a State agency, I must then determine whether the State has waived the defense of State sovereign immunity.

---

[27] Plaintiffs cite *Norville* without acknowledging that the judgment entered by the Court of Special Appeals was vacated on other grounds by the Maryland Court of Appeals.

Without question, county school boards in Maryland have "hybrid qualities" of both a State and local nature. *Donlon v. Montgomery Cnty. Pub. Schs*., 460 Md. 62, 82, 188 A.3d 949, 961 (2018). In other words, they have features consistent with a local entity as well as features consistent with a State instrumentality. *Id.* at 84, 188 A.3d at 961–62. The state/local distinction requires careful scrutiny.

In Maryland, the public schools are organized by county, and each county's public school system is managed by a county board of education. *See* Md. Code (2018 Repl. Vol.), §§ 3-103, 4-101, 4-108 of the Education Article ("Educ."); *Doe #1*, 2021 WL 6072813, at *7; *Brown v. Prince George's Cnty. Bd. of Educ.*, GJH-18-2723, 2019 WL 3944983, at *3 (D. Md. Aug. 20, 2019). Although county school boards in Maryland are established as part of the State's program of public education, they may not buy, sell, or hold property without State approval. *Farrell v. Bd. of Educ. of Allegany Cnty.*, GLR-16-2262, 2017 WL 1078014, at *3 (D. Md. Mar. 21, 2017); *see* Educ. §§ 3-108, 4-109, 4-115. Additionally, the State controls the form of contract for employees of county boards of education, defines and enforces teacher certification requirements, and may reduce programming, order a reorganization, or reconstitute schools that are not meeting State standards. *Lewis v. Bd. of Educ. of Talbot Cnty.*, 262 F. Supp. 2d 608, 613 (D. Md. 2003) (citing Code of Maryland Regulations ("COMAR") 13A.01.04.08, 07.02.01)).

Under Maryland law, "in certain contexts," county boards of education are considered "an arm of the State." *Neal v. Balt. City Bd. of Sch. Comm'rs*, 467 Md. 399, 405, 225 A.3d 66, 69 (2020). Indeed, the Maryland Court of Appeals has recognized that, "in terms of their composition, jurisdiction, funding, and focus," county school boards "clearly have a local flavor, [yet] the county school boards have consistently been regarded as State, rather than county, agencies."

*Chesapeake Charter, Inc. v. Anne Arundel Cnty. Bd. of Educ.*, 358 Md. 129, 136, 747 A.2d 625

(2000).  The court elaborated in *Chesapeake Charter*, *id.* at 135–36, 747 A.2d at 628–29:

> County school boards are creatures of the General Assembly.  Section 3–
> 103 of the Education Article (ED) creates such a board for each county, with limited
> authority to control educational matters that affect the county.  *See* ED § 4–101.  In
> 13 counties, the members of the board are elected by the voters of the county (§ 3–
> 114); in Baltimore City, the members of the board, other than a student member,
> are appointed jointly by the Governor and the Mayor of Baltimore (§ 3–108.1); in
> the other counties, the members are appointed by the Governor from among the
> residents of the county (§ 3–108).  The county school systems are funded in part by
> the State and in part by the counties.  *Hornbeck v. Somerset Co. Bd. of Educ.*, 295
> Md. 597, 458 A.2d 758 (1983).

Further, the court elucidated the underlying rationale for designating county boards as state

agencies.  It explained, *id.* at 136–37, 747 A.2d at 629:

> County school boards are considered generally to be State agencies because
> (1) the public school system in Maryland is a comprehensive State-wide system,
> created by the General Assembly in conformance with the mandate in Article VIII,
> § 1 of the Maryland Constitution to establish throughout the State a thorough and
> efficient system of free public schools, (2) the county boards were created by the
> General Assembly as an integral part of that State system, (3) their mission is
> therefore to carry out a State, not a county, function, and (4) they are subject to
> extensive supervision by the State Board of Education in virtually every aspect of
> their operations that affects educational policy or the administration of the public
> schools in the county.

Yet, the Maryland Court of Appeals also said, *id.* at 137, 747 A.2d at 629: "Although

legally State agencies for those reasons, they are not normally regarded, *for structural or budgetary*

*purposes*, as units within the Executive Branch of the State government.  This becomes evident

when we examine the place of county school boards in the structure and governance of public

education in Maryland."  (Emphasis added).  The court concluded that, *for the purposes of the*

*General Procurement Law*, the school board was local in nature and thus "a county school board

is not a 'unit' within the meaning of that law."  *Id.* at 145, 747 A.2d at 634 (emphasis added).

Notably, this case does not implicate issues of a structural or budgetary nature.  Nor does

it involve procurement.  As indicated, such matters are features associated with a local function.

In *Donlon*, 460 Md. 62, 188 A.3d 949, a teacher employed by the Montgomery County Public School ("MCPS") system filed a whistleblower complaint, contending that the high school at which he worked inflated advanced placement statistics. *Id.* at 70, 188 A.3d at 954. The teacher also alleged that he was subject to retaliation "for his revelations to the print media." *Id.* The Court considered whether the MPCS was a State agency whose employees were protected by the Maryland State Whistleblower Protection Law, Md. Code (2015 Repl. Vol., 2016 Supp.), §§ 5–301–314 of the State Personnel and Pensions Article. *Id.* at 77–103, 188 A.3d at 960–62. It concluded that "a county board of education is not an entity of the State . . . for purposes of the" State's Whistleblower Protection Law. *Id.* at 96, 188 A.3d at 969.

In reaching that conclusion, the Maryland Court of Appeals engaged in a comprehensive analysis of the status of county boards of education in Maryland. *Id.* at 77–103, 188 A.3d at 958–973. It recognized that county school boards have qualities consistent with being State entities as well as those of local entities. *Id.* at 82–83, 188 A.3d at 960–62. For example, county boards of education are not identified by statute as "Principal Departments" of the executive branch of State government. *Id.* at 82, 188 A.3d at 961; *see* Md. Code (2021 Repl. Vol.), § 8-201 of the State Government Article. Yet, they "exist by virtue of the acts of the [Maryland] General Assembly and have been categorized as State agencies . . . ." *Donlon*, 460 Md. at 82, 188 A.3d at 961 (citing *Beka Industries, Inc. v. Worcester Co. Bd. of Educ.*, 419 Md. 194, 212, 18 A.3d 890, 901 (2011)). Moreover, they are subject to extensive supervision by the State Board of Education. *Donlon*, 460 Md. at 84, 188 A.3d at 962. Thus, the Maryland Court of Appeals stated that they "defy 'simple and definitive categorization as either a 'State' or 'local agency or instrumentality for any and all purposes.'" *Id.* at 83, 188 A.3d at 961 (citation omitted). Rather, the determination is complex, not "fixed" or "rigid." *Id.* at 95, 188 A.3d at 968. In a phrase, it depends.

53

Ultimately, the *Donlon* Court determined that, in the context of the suit, the county board of education was not a State agency. *Id.* at 93, 188 A.3d at 967. Therefore, the court concluded that the county teacher was not protected by Maryland's whistleblower law. *Id.* at 96, 188 A.3d at 969.

Nevertheless, numerous cases, both federal and State, have characterized county boards of educations State agencies. *See, e.g.*, *State v. Bd. of Educ. of Montgomery Cnty.*, 346 Md. 633, 635 n.1, 697 A.2d 1334, 1335 n.1 (1997) ("The various county boards of education are State agencies."); *Bd. of Educ. of Prince George's Cnty. v. Sec'y of Pers.*, 317 Md. 34, 44 n.5, 562 A.2d 700, 705 n.5 (1989) ("It is settled that county boards of education are State agencies."); *see Zimmer-Rubert*, 409 Md. at 205–06, 973 A.2d at 236 (recognizing that the Baltimore County Board of Education is a State agency); *J.G. by & through Gusman v. Prince George's Cnty. Bd. of Educ.*, PWG-16-1008, 2017 WL 930130, at *4 (D. Md. Mar. 8, 2017) (concluding that Maryland school boards are state agencies and not "persons" under § 1983); *Wood v. Bd. of Educ. of Charles Cnty.*, GJH-16-00239, 2016 WL 8669913, at *5 (D. Md. Sept. 30, 2016) (same); *Schiffbauer v. Schmidt*, 95 F. Supp. 3d 846, 851–52 (D. Md. 2015) (same); *see also Shank v. Balt. City Bd. of Sch. Comm'rs*, WMN-11-1067, 2014 WL 198343, at *2 (D. Md. Jan. 14, 2014) ("The Eleventh Amendment explicitly bars [the plaintiff's] suit against the Board of Education as a state agency with respect to his federal law claims . . .") (alteration in original) (quoting *Chi v. Bd. of Educ. of Harford Cnty.*, HAR-93-3569, 1995 WL 131288, at *3 (D. Md. Feb. 6, 1995)) (internal quotation marks omitted)); *Mayo v. Bd. of Educ. of Prince George's Cnty.*, 797 F. Supp. 2d 685, 689 (D. Md. 2011) (same), *aff'd*, 713 F.3d 735 (4th Cir. 2013); *James v. Frederick Cnty. Pub. Schs.*, 441 F. Supp. 2d 755, 760 (D. Md. 2006) (same); *Norville*, 160 Md. App. at 38, 862 A.2d at 492 (Hollander, J.).

And, of particular relevance here, even since *Donlon* was decided, courts have continued to conclude, almost routinely, that county school boards in Maryland are State agencies and therefore not "persons" subject to suit under § 1983. *See, e.g., Doe #1*, 2021 WL 6072813, at *8 (concluding that "county school boards in Maryland are controlled by the state and therefore are not 'persons' within the meaning of the § 1983"); *Gandy v. Howard Cnty. Bd. of Educ.*, GLR-20-3436, 2021 WL 3911892, at *12 (D. Md. Sep. 1, 2021) (stating that "it is well established in Maryland that county school boards as not considered 'persons' under § 1983 and therefore cannot be subject to liability under the statute"); *Agbara v. Prince George's Cnty. Pub. Sch*, TJS-20-0306, 2020 WL 7425298, at *6 (D. Md. Dec. 18, 2020) ("Because the Board does not qualify as a 'person' under § 1983, [plaintiff's] § 1983 claims against the Board are not viable and will be dismissed with prejudice pursuant to Rule 12(b)(6).").

The Fourth Circuit has articulated a nonexclusive list of four factors to be considered to determine whether an entity is sufficiently connected to the State for purposes of immunity. They are: (1) "whether the state treasury will be responsible for paying any judgment that might be awarded"' (2) "whether the entity exercises a significant degree of autonomy from the state," (3) "whether [the entity] is involved with local versus statewide concerns," and (4) "how [the entity] is treated as a matter of state law. *Ram Ditta*, 822 F.2d at 457–58 (footnotes omitted, alterations added); *see Lane*, 660 F3d. App'x at 195; *cf. Van Story v. Wash. Cnty. Health Dep't*, ELH-17-3590, 2019 WL 3340656, at *9 (D. Md. July 25, 2019), *aff'd*, 380 F. App'x 725 (4th Cir. 2020) (per curiam).

As noted, as to the first factor, a court examines "'whether the state treasury will be responsible for paying any judgment that might be awarded.'" *Lane*, 660 F. App'x at 195 (quoting *Ram Ditta*, 822 F.2d at 457). Nevertheless, the Fourth Circuit has "concluded that a judgment's

55

effect on the state treasury, though still 'of considerable importance, does not deserve dispositive preeminence.'" *Id.* (quoting *Oberg*, 745 F.3d at 137 n.4).  As discussed, *infra*, by statute the State has agreed to indemnify school board defendants, supporting the argument that the Board qualifies as a State agency.  *See* ECF 31 at 2.

For the second factor, a court analyzes whether the entity exercises a significant degree of autonomy from the State.  This factor weighs in favor of defendants.  The Board is subject to extensive supervision by the State Board of Education.  The Board cannot buy, sell, or hold property without State approval.   And, the State controls employees' contracts, defines certification requirements, may reduce programming, may order a reorganization, or may reconstitute schools that are not meeting State standards.  *Lewis*, 262 F. Supp. 2d at 613.  As such, it appears that the State exercises considerable control over the Board.

For the third factor, a court analyzes whether the entity is involved with local versus statewide concerns. Certainly, a county school board has hybrid features, as outlined in *Donlon*, and is undoubtedly concerned with the interests of the local residents.  But, this suit is rooted in the Board's performance of its core State functions, duties, and responsibilities: providing a quality education to and discipline of students, without disruption, in an atmosphere without bias or prejudice.  This responsibility is surely very important to the residents of the county.  But, it is also central to the State's mission.  This factor weighs in favor of viewing the Board as a State agency.

The fourth factor requires a court to examine how the entity is treated as a matter of state law.  As discussed, *infra*, C.J. § 5-518 explicitly states: "A county board of education may not raise the defense of sovereign immunity to any claim of $400,000 or less."[28]  As examined in

---

[28] C.J. § 5-518 was recently amended by Acts 2023, ch. 5, § 1 and ch. 6, § 1.  These amendments are effective on October 1, 2023.  For the purpose of this discussion, I analyze the

*Zimmer-Rubert*, 409 Md. at 216–17, 973 A.2d at 242–43, the statutory provision waives both State sovereign immunity and Eleventh Amendment immunity, in federal and state courts, subject to a cap of $400,000.

C.J. § 5-518 is titled: "Immunity — County boards of education."  It provides, in part (bold added):

> (b) *Claims for more than $400,000.* — A county board of education, described under Title 4, Subtitle 1 of the Education Article, may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or, if self-insured or a member of a pool described under § 4-105(c)(1)(ii) of the Education Article, above $400,000.

> (c) *Claims for $400,000 or less.* — **A county board of education may not raise the defense of sovereign immunity to any claim of $400,000 or less.**

> (d) *Parties in tort claims; separate litigation of issues.* — (1) The county board shall be joined as a party to an action against a county board employee, county board member, or volunteer that alleges damages resulting from a tortious act or omission committed by the employee in the scope of employment, by the county board member within the scope of the member's authority, or by the volunteer within the scope of the volunteer's services or duties.
> (2) The issue of whether the county board employee acted within the scope of employment may be litigated separately.
> (3) The issue of whether the county board member acted within the scope of the member's authority may be litigated separately.
> (4) The issue of whether the volunteer acted within the scope of the volunteer's services or duties may be litigated separately.

> (e) *Employees.* — A county board employee acting within the scope of employment, without malice and gross negligence, is not personally liable for damages resulting from a tortious act or omission for which a limitation of liability is provided for the county board under subsection (b) of this section, including damages that exceed the limitation on the county board's liability.

In *Zimmer-Rubert*, 409 Md. 200, 973 A.2d 233, the Maryland Court of Appeals construed

C.J. § 5-518(c) in regard to a claim under the Age Discrimination in Employment Act, 29 U.S.C.

---

version of C.J. § 5-518 in effect at this time.  But, the statutory changes are not material to this case.

§ 621 *et seq*., brought by an educator against the Board of Education of Baltimore County.  At the time, C.J. § 5-518(c) provided: "A county board of education may not raise the defense of sovereign immunity to any claim of $100,000 or less."  The court concluded that the statute constituted a waiver of both State sovereign immunity and Eleventh Amendment immunity, in federal and State courts, subject to the statutory cap.  *Id.* at 216–17, 973 A.2d at 242–43.

Notably, in their Reply, defendants assert, ECF 31 at 1: "There is no dispute that Defendant School Board . . . should only remain a defendant to indemnify any judgment arising from the alleged tortious acts of [the individual defendants].  Defendants add, *id.* at 2: "[T]here is no dispute that Defendant School Board should remain a defendant for indemnification purposes only [because] all of Plaintiffs' claims are premised upon the employee actions . . . ."  Thus, defendants seem to concede that there is some basis for the Board's continued status as a defendant.

Based on the foregoing, I conclude that, in the context of this case, the Board functioned as a State agency.  However, as noted, by virtue of the removal of the case, the State waived Eleventh Amendment immunity.  And, under C.J. § 5-518, the State has also waived State sovereign immunity, up to a maximum of $400,000 in damages.

### 3. Sovereign Immunity as to the Individual Defendants

As mentioned, personal capacity suits, which seek to impose individual liability on a government official for action taken under color of State law, are not barred by the Eleventh Amendment.  *Murphy*, 2022 WL 17484286, at *3.  Moreover, under C.J. § 5-518, although covered individuals are not personally liable for damages, they are not immune from suit.  *See Gambrill v. Bd. of Educ. of Dorchester Cnty.*, 481 Md. 274, 307–09, 281 A.3d 876, 895–96 (2022); *see also Bd. of Educ. of Prince George's Cnty. v. Marks-Sloan*, 428 Md. 1, 32, 50 A.3d 1137, 1155 (2012) ("Tort suits may be brought against county board employees and judgments may be entered against

them."); *Doe v. Bd. of Educ. of Prince George's Ctny*, 888 F. Supp. 2d 659, 668 (D. Md. 2012) (declining to dismiss suit on immunity grounds, pursuant to C.J. § 5-518).

By statute, however, the Board "shall be joined as a party to an action against a county board employee" and indemnify such individuals acting within the scope of employment for damages up to $400,000.  C.J. § 5-518(d)(1); s*ee, e.g., Neal*, 467 Md. at 424, 225 A.3d at 81 ("The clear intent of the General Assembly in enacting § 5-518 was to protect employees by requiring joinder of county boards of education by way of indemnification against the board."); *Marks-Sloan*, 428 Md. at 12–13, 50 A.3d at 1144–45; *see also Doe v. Cmty. College of Balt. Cnty.*, 595 F. Supp. 3d 392, 408–18 (D. Md. 2022) (Hollander, J.).  Indemnification applies to the extent successful plaintiffs seek damages.  *Gambrill*, 481 Md. at 304, 281 A.3d at 893.  And, in any event, to the extent that plaintiffs seek prospective injunctive relief, sovereign immunity does not apply. *Doe*, 595 F. Supp. 3d at 409 ("'[T]he Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.'") (quoting *Lee-Thomas*, 666 F.3d at 249).

Therefore, I conclude that the doctrine of State sovereign immunity does not bar the claims in Counts IX and X as to the individual defendants.  This does not mean that plaintiffs have necessarily stated a claim, however.  That is a different question, discussed below.

## C.  Sufficiency of the Allegations, in General

That the defendants may be sued under § 1983 does not resolve their challenge as to the sufficiency of the § 1983 claims.  The question remains whether plaintiffs have stated viable § 1983 claims.

The Amended Complaint only sparsely refers to each of the individual defendants.  And, in many instances plaintiffs do not distinguish the individuals from the Board.  For example,

plaintiffs assert that K.H. was "pulled" from class by "Agents" of the Board, without identifying the persons involved. *See* ECF 2, ¶ 70. Similarly, plaintiffs assert that K.H. told the "Board" that she used gold face paint, but the suit fails to identify the person or persons with whom K.H. spoke. *Id.* ¶ 71.

In particular, the Amended Complaint refers to each of the individual defendants by name as follows, *id.*, ¶¶ 8–12, 22, 85:

> 8. Defendant Patrick Bathras ("Defendant Bathras") is a citizen of Anne Arundel County, Maryland. At all times relevant herein, Defendant Bathras was a Maryland citizen and was a principal hired by the School System assigned to work at the School.
>
> 9. Defendant Paige Chang ("Defendant Chang") is a citizen of Anne Arundel County, Maryland. At all times relevant herein, Defendant Chang was a Maryland citizen and was an assistant principal hired by the School System assigned to work at the School.
>
> 10. Defendant Janine Robinson ("Defendant Robinson") is a citizen of Anne Arundel County, Maryland. At all times relevant herein, Defendant Robinson was a Maryland citizen and was a regional assistant superintendent hired by the School System assigned to work with the School.
>
> 11. Defendants Board, Bathras, Chang, and Robinson, and their agents, servants, and/or employees are singularly referred to as "Board Defendant" or collectively referred to as "Board Defendants."
>
> 12. Defendants Bathras, Chang, and Robinson are also collectively referred to as "Individual Defendants."
>
> *   *   *
>
> 22. Defendant Chang (Assistant Principal at Severna Park High School), Defendant Bathras (Principal at Severna Park High School), and Defendant Robinson (Regional Assistant Superintendent for Glen Burnie and Severna Park) are all employees, agents, and/or servants of Defendant Board.
>
> *   *   *
>
> 85. Student Doe and her father, Mark Heward, made repeated requests that Defendant Board reconsider the terms of Student Doe's suspension, initiating conversations with the Principal, Assistant Principal, and the Regional Assistant Superintendent for Glen Burnie and Severna Park High School (as identified above, Defendant Chang, Defendant Bathras, and Defendant Robinson).

In terms of collective allegations, plaintiffs, as noted, generally lump the actions of the individual defendants with those of the Board. The following paragraphs are illustrative, ECF 2, ¶¶ 82–84:

> 82. Defendant Board and Individual Defendants misrepresented that the photograph was "brown" face, not gold face.
>
> 83. Defendant Board and Individual Defendants attached the label of bias, racial bias, and racist to Student Doe in punishing Student Doe.
>
> 84. Defendant Board and Individual Defendants attached the label of bias, racial bias, and racist to Student Doe in refusing to capitulate that Student Doe had no intent to cause any harm to any student or any other person, and was, in fact, wearing gold paint on her face outside School hours, in her private home, in a private conversation, that was shared without her consent, did not involve any School property, and did not mention the School.

Thus, the Amended Complaint does not ascribe any particular conduct to any particular defendant. It is difficult to tease out who engaged in what conduct or what role, if any, each individual defendant played in the events described in the Amended Complaint.

In *Langford v. Joyner*, 62 F.4th 122 (4th Cir. 2023), the Fourth Circuit upheld a dismissal of a prisoner's Eighth Amendment deliberate indifference claim, lodged against multiple defendants. The Court noted that the Complaint made "only collective allegations against all 'defendants,' without identifying how each Defendant personally interacted with [the plaintiff] or was responsible for the denial of his Eighth Amendment rights." *Id.* at 125. As a result, it was "'impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed.'" *Id.* (citation omitted). The Court concluded that the "repeated general references to 'Defendants'" were not sufficient to state a plausible claim. *Id.*

This case suffers from similar deficiencies. However, in contrast to *Langford*, the defendants submitted several exhibits with the Motion, some of which I have deemed integral to the Amended Complaint and therefore subject to consideration. Among other things, these

documents outline the ways in which Chang and Bathras interacted with plaintiffs regarding the underlying suspension and the appeal, as well as Robinson's denial of the appeal.

Accordingly, I conclude that the Amended Complaint, when coupled with the exhibits integral to the suit, contains allegations as to Chang, Bathras, and Robinson that are sufficient to permit further analysis of the particular claims against them. I turn to a review of the claims.

### D. Article 40 (Free Speech) (Count VIII); First Amendment (Count IX)

In Count VIII, plaintiffs assert a claim against all defendants for "Violation of Rights Secured Under Article 40 of the Maryland Declaration of Rights." *See* ECF 2, ¶¶ 191–201. And, as noted, Count IX asserts a violation of the First Amendment to the Constitution, made applicable to the states through the Fourteenth Amendment. *Cantwell v. State of Conn.*, 310 U.S. 296, 303 (1940); *see also Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. ___, 139 S. Ct. 1921, 1928 (2019). As discussed, the federal constitutional claim is lodged pursuant to 42 U.S.C. § 1983.

The First Amendment to the Constitution provides, in part: "Congress shall make no law . . . abridging the freedom of speech." Article 40 provides that "every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects." Article 40 of Maryland Declaration of Rights is the State constitutional counterpart to the First Amendment. It is ordinarily interpreted *in pari materia* with its federal analog. *See Kensington Volunteer Fire Dep't, Inc.*, 684 F.3d at 468 n.3 ("Article 40 is 'co-extensive' with the First Amendment, and is construed *in pari materia* with it.") (quoting *Newell v. Runnels*, 407 Md. 578, 967 A.2d 729, 743 n.11 (2009)); *Borzilleri v. Mosby*, 189 F. Supp. 3d 551, 556–57 (D. Md. 2016), *aff'd*, 874 F.3d 187 (4th Cir. 2017); *Nefedro v. Montgomery Cnty.*, 414 Md. 585, 593 n.5, 996 A.2d 850, 855 n.5 (2010). Therefore, I shall consider these claims together, by reference to the First Amendment.

### 1.  First Amendment Principles, in General

"The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citations omitted).  "'Premised on mistrust of governmental power,' the First Amendment 'stands against attempts to disfavor certain subjects or viewpoints . . . .'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010); *see Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949) (explaining that "[t]he right to speak freely and to promote diversity of ideas" and "to invite dispute" are hallmarks of the First Amendment).

Pursuant to the First Amendment, the "government generally has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. ___, 140 S. Ct. 2335, 2346 (2020) (internal quotation marks and citation omitted).  Indeed, a "core postulate of free speech law" is that the "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. ___, 139 S. Ct. 2294, 2299 (2019); *see Barr*, 140 S. Ct. at 2346 (stating that the First Amendment prohibits government actors from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content").  Thus, the Supreme Court has said: "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 365 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

Put another way, the government "'ordinarily'" may not "'prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence.'" *Black*, 538 U.S. at 365 (quoting *Whitney v. California*, 274 U.S. 357, 374 (1927) (Brandeis, J., concurring)); *see Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642

(1994); *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972); *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 328 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986).  As the Supreme Court has said, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

In addition to traditional "speech," the First Amendment applies to expressive conduct. For example, "[w]hat one chooses to wear can communicate an expressive message to others." *Tindle v. Caudell*, 56 F.3d 966, 969 (8th Cir. 1995).  The Supreme Court has explained, *Johnson*, 491 U.S. at 402–03:

> The First Amendment literally forbids the abridgment only of "speech," but we have long recognized that its protection does not end at the spoken or written word.  While we have rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," *United States v. O'Brien*, *supra*, at 376, 88 S. Ct., at 1678, we have acknowledged that conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," *Spence*, *supra*, at 409, 94 S. Ct., at 2730.

When a First Amendment claim is asserted, the "first inquiry a court must undertake" is "whether the plaintiff has engaged in 'protected speech.'" *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 797 (1985)).  Conduct must be "expressive conduct" in order to be afforded First Amendment protection, meaning that it must be done with the intent to "express an idea." *Johnson*, 491 U.S. at 403 (internal quotations and citation omitted).  "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the Supreme Court has "asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* at 404 (quoting *Spence v. State of Wash.*, 418 U.S. 405, 410–11 (1974)).  The Eighth

Circuit explained in *Tindle*, 56 F.3d at 969 (quoting *Johnson*, 491 U.S. at 404): "Wearing a particular outfit or costume is non-verbal conduct that is protected as speech under the first amendment if it is intended to convey a 'particularized message' and if the likelihood is great that the message will be understood by those who view it."

Notably, "entertainment, as well as news, enjoys first amendment protection." *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 578 (1977); *see Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981); *see also Iota xI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 392 (4th Cir. 1993) (concluding that the First Amendment applied to a "low-grade" fraternity skit because it was expressive entertainment).  Nor is a "succinctly articulable message" a "condition of constitutional protection." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995).

Of relevance here, "[a]s a general matter, social media is entitled to the same First Amendment protections as other forms of media." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019) (brackets added) (citing *Packingham v. North Carolina*, 582 U.S. 98, 106–08 (2017)), *judgment vacated as moot*, ___ U.S. ___, 141 S. Ct. 1220 (2021). "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears.'" *Knight First Amendment Inst. at Columbia Univ.*, 928 F.3d at 237 (cleaned up) (quoting *Brown v. Entm't. Merchants. Ass'n*, 564 U.S. 786, 790 (2011)).  Indeed, the Fourth Circuit has held that a Facebook page can constitute a public forum, *Davison*, 912 F.3d at 687, and that the posting of a comment on Facebook constitutes protected speech.  *Bland*, 730 F.3d at 385–86.

## 2. The First Amendment in the School Setting

It has been the "unmistakable holding" of the Supreme Court for a century that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." *Tinker v. Des Moines Indep. Cnty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Bartels v. Iowa*, 262 U.S. 404 (1923)). Indeed, it is a basic truth of our First Amendment jurisprudence that "[n]either students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. With this in mind, I turn to review the First Amendment in the context of the "special characteristics" of a school setting. *Id.* at 503.

*Tinker*, 393 U.S. 503, is central to the assessment of any claim that a public school violated a student's right to free speech. In *Tinker*, three students—two in high school and one in "junior high school"—planned to wear black armbands to school to protest the Vietnam War. *Id.* at 504. The school principals learned of this plan and collectively "adopted a policy that any student wearing an armband to school would be asked to remove it, and if he refused he would be suspended until he returned without the armband." *Id.* Although the three students "were aware of the regulation that the school authorities adopted," they wore black armbands to school. *Id.* As a result, "[t]hey were all sent home and suspended from school until they would come back without their armbands." *Id.* The students did not return to school until after their planned protest ended, approximately two weeks later. *Id.* Their parents filed suit under § 1983, seeking nominal damages as well as injunctive relief. *Id.* at 505. The district court upheld the suspensions and the Eighth Circuit affirmed. *Id.*

The Supreme Court reversed, concluding that "the wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by

those participating in it," and was "closely akin to 'pure speech' which . . . is entitled to comprehensive protection under the First Amendment." *Id.* at 505–06. The Court reiterated its longstanding position that "First Amendment rights . . . are available to teachers and students," and that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. The Court explained the extreme importance of allowing students to share their opinions, so long as it does not "materially disrupt[] classwork or involve[] substantial disorder or invasion of the rights of others." *Id.* at 513. Because the school did not adequately explain how the students' silent wearing of armbands caused a "substantial disruption" to the school, the Court found in favor of the students. *Id.* at 514.

*Morse v. Frederick*, 551 U.S. 393 (2007), is also instructive. There, a high school student brought a § 1983 action against a principal and school board, alleging a violation of his First Amendment rights based on a ten-day suspension for waving a banner off campus, but at a school-approved activity. *Id.* at 396. The principal believed the banner conveyed a message that promoted illegal drug use. *Id.* The Court reiterated its position in *Tinker* that public school students "do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Id.* (quoting *Tinker*, 393 U.S. at 506). But, the Court also reiterated that "'the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings . . . .'" *Id.* at 396–97 (citation omitted).

In particular, the Court recognized "that the rights of students 'must be applied in light of the special characteristics of the school environment.'" *Id.* at 397 (citations and some internal quotations omitted). Therefore, the Court expressly held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." *Id.* For that reason, the Court "conclude[d] that the school officials in this case [did]

not violate the First Amendment by confiscating the pro-drug banner and suspending the student responsible for it." *Id.*

In sum, the *Morse* majority recognized that student speech "celebrating illegal drug use at a school event, in the presence of school administrators and teachers . . . poses a particular challenge for school officials working to protect" students from "the dangers of drug abuse." *Id.* at 408. Although the Court reiterated that "schools may not prohibit student speech because of 'undifferentiated fear or apprehension of disturbance,'" *id.*, it concluded that a school's interest in preventing illegal drug use "extends well beyond an abstract desire to avoid controversy." *Id.* at 409.

More recently, in *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. ___, 141 S. Ct. 2038 (2021), the Court found that a school violated a student's First Amendment rights when it punished her for conduct that took place at her home, during a weekend, involving the transmission to her friend of a Snapchat that criticized both the school and the cheerleading team in vulgar terms. Specifically, after the student learned that "[s]he did not make the varsity cheerleading team or get her preferred softball position," she posted a photo of herself with a friend, "with middle fingers raised," containing the caption: "Fuck school fuck softball fuck cheer fuck everything." *Id.* at 2043. It was disseminated to 250 "friends." *Id.* The student posted another message with no image, stating: "Love how me and [another student] get told we need a year of jv before we make varsity but tha[t] doesn't matter to anyone else?" *Id.* (alterations in *Mahanoy*). *Id.* One of the student's Snapchat "friends" took a picture of these posts "and shared them with other members of the cheerleading squad." *Id.* The images were also shared with another student's mother, a coach of the squad. *Id.* Then, "[t]hat week, several cheerleaders and other students approached

the cheerleading coaches 'visibly upset' about [the student's] posts" and "[q]uestions about the posts persisted during an Algebra class taught by one of the two coaches." *Id.*

Thereafter, "the coaches decided that because the posts used profanity in connection with a school extracurricular activity, they violated team and school rules" and they suspended the student from the cheerleading team for a year. *Id.* School officials such as "[t]he school's athletic director, principal, superintendent, and school board, all affirmed [the student's] suspension from the team." *Id.* The student, with her parents, filed suit. The district court and the Third Circuit found that the school's actions violated the student's rights under the First Amendment. *Id.* at 2043–44. The Supreme Court affirmed.

Of import here, the Supreme Court reiterated that "students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'" 141 S. Ct. at 2044–45 (quoting *Tinker*, 393 U.S. at 506). The *Mahanoy* Court explained that there are "three specific categories of student speech that schools may regulate in certain circumstances: (1) 'indecent,' 'lewd' or 'vulgar' speech uttered during a school assembly on school grounds . . . (2) speech, uttered during a class trip, that promotes 'illegal drug use,' . . . and (3) speech that others may reasonably perceive as 'bear[ing] the imprimatur of the school,' such as that appearing in a school newspaper." *Id.* at 2045 (internal citations removed).

To be sure, the Court recognized that "schools have a special interest in regulating on-campus speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *Id.* at 2045. But, the Court observed that the student's posts, "while crude", "did not amount to fighting words." *Id.* at 2046. It also took into account that "[h]er posts appeared outside of school hours from a location outside the school," that "she did not identify the school in her posts or target any member of the school community with vulgar or abusive language," and

that she "transmitted her speech through a personal cellphone, to an audience consisting of her private circle of Snapchat friends." *Id.* at 2047. The Court was of the view that "these features of [the student's] speech, while risking transmission to the school itself, nonetheless . . . diminish the school's interest in punishing [the student's] utterance." *Id.*

In addition, the Court found "no evidence in the record of the sort of 'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the school's action." *Id.* Instead, the record showed that "discussion of the matter took, at most, 5 to 10 minutes of an Algebra class 'for just a couple of days' and that some members of the cheerleading team were 'upset' about the content of [the student's] Snapchats." *Id.* at 2047–48. Thus, the Court concluded that the punishment violated the student's First Amendment rights.

Also of import, the Court recognized that there are "several types of off-campus behavior that may call for school regulation." *Id.* at 2045. These "include[] serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices, including material maintained within school computers." *Id.*

And, of relevance here, a school "'may regulate off-campus behavior insofar as the off-campus behavior creates a foreseeable risk of reaching school property and causing a substantial disruption to the work and discipline of the school.'" *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 571 (4th Cir. 2011) (quoting *Doninger v. Niehoff*, 527 F.3d 41, 51 (2d Cir. 2008)); *see also Morse*, 551 U.S. at 396–97 ("[T]he constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and . . . the rights of students must be applied in light of the special characteristics of the school environment.") (citations and

70

internal quotation marks omitted).   To "pass constitutional muster," moreover, "'[i]t is not necessary that the school administration stay a reasonable exercise of restraint 'until disruption actually occur[s].'" *T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.*, 807 F. Supp. 2d 767, 782 (N.D. Ind. 2011) (quoting *Shanley v. Northeast Indep. Sch. Dist., Bexar Cnty., Tex.*, 462 F.2d 960, 970 (5th Cir. 1972)) (cleaned up).   But, "'*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance.'" *Smith-Green Cmty. Sch. Corp.*, 807 F. Supp. 2d at 782 (quoting *Saxe v. State College Area Sch. Dist.*, 240 F. 3d 200, 211 (3rd Cir. 2001)).

### 3.  Analysis

Plaintiffs assert that the Snap, disseminated via Snapchat, was simply the product of K.H.'s attempt at humor.  *See* ECF 2, ¶ 49 (contending that Student Doe sent a "silly selfie"); *id.* ¶ 86 (labeling the Snap as "playful"). In his appeal to Bathras, for example, Mr. Heward explained that (1) "this was an impulsive, creative expression and not meant to insult"; (2) concerns from K.H.'s friends "immediately made [K.H.] rethink how this might have been misperceived, compared to the humour [sic] of which it was meant," and (3) K.H. "honestly believed [the Snap] was a 'silly' picture amongst close friends."  ECF 14-8 at 2–3.

Defendants do not argue that K.H. failed to engage in speech that falls under the umbrella of the First Amendment.  *Cf. Smith-Green Cmty. Sch. Corp.*, 807 F. Supp. 2d at 775 (stating that crude, lewd, and provocative photographs posted online by high school students were "intended to be humorous" and were "juvenile and silly — and certainly not a high-minded effort to express an idea," but they nonetheless constituted protected speech).  Therefore, I need not consider whether the Snap constituted protected speech.

According to defendants, ECF 15-1 at 33, the Snap amounted to "severe bullying or harassment." Therefore, they claim that the School could properly discipline K.H. under the "severe bullying" exception recognized in *Mahanoy*, 141 S. Ct. 2038, and applied in *Chen v. Albany Unified Sch. Dist.*, 56 F. 4th 708 (9th Cir. 2022). In particular, defendants state: "K.H. sent the K.H. Photo to eight SPHS students that was racially demeaning and derogatory in nature and consequently she received a two-day school suspension because her actions created a hostile school environment negatively affecting other SPHS students[] and caused a substantial disruption to the entire school environment the very next school day after her actions." ECF 15-1 at 46–47.

Plaintiffs counter that neither *Chen* nor *Mahanoy*'s "severe bullying" exception applies here because K.H. was not accused of bullying and because "[t]here was no intentional conduct by Student Doe targeting any student." ECF 21 at 32–35. Further, plaintiffs dispute that there was "substantial disruption" to the School environment, so as to warrant discipline. *Id.* at 33–34. Instead, plaintiffs argue that, under *Mahanoy*, defendants violated K.H.'s constitutional rights by punishing her for out-of-school speech that did not pertain to the School. *Id.* at 32–33.

In their Reply, defendants reiterate that *Chen* applies. They assert that "the actions of Defendants Robinson, Bathras and Chang were not about infringing upon K.H.'s freedom of speech rights, but instead based upon their duty and obligations to protect the entire SPHS student population from the development of a racially hostile school environment that would likely result if K.H.'s misconduct was permitted without any accountability." ECF 31 at 9–10.[29]

Defendants' reliance on the "severe bullying" exception applied in *Chen*, 56 F.4th 708, is misplaced because, as plaintiffs correctly observe, K.H. was not charged with bullying or

---

[29] Defendants seem to vacillate between claims that there was actual disruption at School and that there was a need by the School to prevent *future* disruption. ECF 15-1 at 5, 19, 25; ECF 31 at 10.

harassment. *See* ECF 21 at 5.  Rather, she was accused of a violation of policies concerning "Bias Motivated Behavior and Misuse of Social Media" and suspended on that basis.  ECF 34-1 at 1. Therefore, defendants cannot now claim that K.H. was suspended for engaging in "cyberbullying and harassment," which is governed by a separate policy provision.  ECF 31 at 14.

Moreover, I am constrained at this stage to accept as true plaintiffs' allegation that K.H. did not intend the Snap to be racially demeaning and derogatory in nature.  Therefore, I need not consider defendants' competing assertion that K.H. intended to create a "racially hostile school environment."  ECF 31 at 9.

Notably, defendants assert that K.H. intended to send the Snap, but they have not pointed to any allegations that, if proven, would establish that K.H. sent the Snap with malevolent intent. Rather, the facts cited by defendants seem to show K.H.'s poor taste and immature judgment. [30] Indeed, as the Third Circuit has observed, "[s]tudents use social media . . . with remarkable frequency," sometimes in a "high-minded" way, but often in a way that is "mundane or plain silly." *B.L. by & through Levy v. Mahanoy Area Sch. Dist.*, 964 F.3d 170, 179 (3rd Cir. 2020), *aff'd*, 141 S. Ct. 2038 (2021).

Even assuming that defendants may assert the "severe bullying" exception, *Chen* would not defeat the plaintiffs' claim.  *Chen* is procedurally and factually inapposite.

---

[30]  As noted, K.H. was thirteen years of age at the time.  The developmental growth of a thirteen-year-old child was recently discussed in an article in *The New York Times*.  *See* Jessica Bennett, *Being 13*, N.Y. TIMES (Sept. 20, 2023), https://perma.cc/26NU-V6NU.  The author wrote, *id.*:

> What is known is that at age 13, a person is still more than a decade away from having a fully developed prefrontal cortex, the part of the brain responsible for decision-making and impulse control. In other words, adolescents are moving into this messy digital world at a time when they desire social attention most — and are not yet wired for restraint.

In *Chen,* public high school students sued the school district and school officials, alleging their First Amendment and due process rights were violated as a result of disciplinary actions based on their use of social media.  56 F.4th at 716.  The Ninth Circuit upheld the grant of summary judgment in favor of the defendants, concluding that the School properly disciplined two of the students for bullying.  *Id.* at 711.

In particular, over a five-month period, multiple students used a private Instagram account, followed by thirteen individuals, to share "a number of cruelly insulting posts" about certain students.  *Id.*  They "ranged from immature posts making fun of a student's braces, glasses, or weight to much more disturbing posts that targeted vicious invective with racist and violent themes against specific Black classmates."  *Id.*  Although the "account was intended to be private, knowledge of its contents eventually spread to the school."  *Id.* at 712.  A group of ten students gathered at school, "several of whom were upset, yelling, or crying."  *Id.* at 712–13.  The school's administration became involved.  *Id.* at 713.  And, because "the posts depicting lynching and nooses could be construed as threats of violence," a school administrator called the police.  *Id.*  School administrators and police officers met with and interviewed students.  *Id.*  The next day, the school suspended three students who were responsible for the account.  *Id.*  Two of the students were recommended for expulsion on the ground that the "posts on the account constituted 'harassment and bullying based on race and gender.'"  *Id.*

At a meeting, the teachers shared that "a lot of students were upset by what they had heard about the account and wanted to talk about it in class, which disrupted [the teachers'] plans for the class."  *Id.* (alteration in *Chen*).  Multiple students reported feeling unsafe at school.  *Id.*  Further, the "school counselors and mental health staff were inundated with students needing help to handle

their feelings of anger, sadness, betrayal and frustration about the racist posts and comments in the Instagram account." *Id.*

The school board voted to expel two students. *Id.* at 714. Thereafter, the students filed federal lawsuits, alleging violations of the First Amendment and their due process rights. *Id.* at 714–15. The district court dismissed the due process claims and granted summary judgment to defendants as to the First Amendment claims. *Id.* at 716.

The Ninth Circuit affirmed the lower court's decision. *Id.* Although the speech took place off-campus, the court noted that "the speech bore a sufficient nexus to [the school] and its students to be susceptible to regulation by the school." *Id.* The court observed that the posts "include[d] vicious invective that was targeted at specific individuals and that employed deeply offensive and insulting words and images that . . . contribute nothing to the 'marketplace of ideas.'" *Id.* at 718 (quoting *Mahanoy*, 141 S. Ct. at 2045). Moreover, the court stated that "severe targeted harassment of fellow students based on their physical characteristics . . . threatens the targeted students' 'sense of physical, as well as emotional and psychological, security.'" *Chen*, 56 F.4th at 718 (quoting *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1152 (9th Cir. 2016)). And, it determined that "the likelihood of 'substantial disruption of or material interference with school activities' from such malicious abuse aimed at particular students is equally obvious and . . . amply demonstrated in the record here." *Chen*, 56 F.4th at 718 (quoting *Tinker*, 393 U.S. at 514). The court observed that one student had created a "ticking time bomb of vicious targeted abuse that could be readily detonated by anyone following the account," and therefore he could "hardly be surprised that his school did not look the other way when that shrapnel began to hit its targets at the school." *Chen*, 56 F.4th at 723.

*Chen* is distinguishable from this case in several critical ways.  This case, unlike *Chen*, is not at the summary judgment stage.  Moreover, *Chen* involved targeted, repeated, deliberate, and vicious bullying conducted by multiple students over the course of several months; the malicious intentions of the students in *Chen* could not be disputed.  In contrast, K.H. transmitted one photo of herself, not of another student.  Clearly, she did not target a particular individual.  And, plaintiffs insist that K.H. did not wear "blackface" or intend to offend anyone.

As indicated, K.H. did not disseminate the Snap outside of her small group of friends.  Nonetheless, as happens with social media, the Snap was published, without K.H.'s permission.  It then reached many other students.  Indeed, "[s]ocial media, as its name implies, has a dual private/public character," and "its postings often travel far and wide."  *Carey v. Throwe*, 957 F.3d 468, 476, *cert. denied*, ___ U.S. ___, 141 S. Ct. 1054 (2021).[31]  Some of the students who saw the Snap were offended by it and others were angered by it.

The feelings of the students who were offended or angered are important, of course.  And, they are certainly entitled to their feelings, as defendants point out.  ECF 15-1 at 23; ECF 36-2 at 1.[32]  But, that does not mean that K.H.'s conduct was intended in the way that others interpreted it.  The same cannot be said about the conduct at issue in *Chen*.  For that reason, accepting

---

[31] The ease with which electronic information can be disseminated constitutes a "new reality."  *United States v. Loughry*, 983 F.3d 698, 705 (4th Cir. 2020) (explaining Twitter); *but see United States v. Loughry*, 996 F.3d 729 (4th Cir. 2021) (en banc) (per curiam) (affirming district court by evenly divided court).  Information can quickly go "viral."  The Cambridge Dictionary defines "viral," in relevant part, as a term "used to describe something that quickly becomes very popular or well known by being published on the internet or sent from person to person by email, phone, etc." *Viral*, Cambridge Dictionary, https://perma.cc/4U4V-HZHW..

[32] The reaction of those students was presumably a factor in the swift decision of defendants to suspend K.H.  In today's social and political climate, the educators undoubtedly may have felt a sense of urgency to respond.  They were, in a proverbial sense, between a rock and a hard place.  Failure to act immediately might have led to criticism of them for condoning conduct that was perceived to be racially offensive.

plaintiffs' allegations as true, *Mahanoy*'s "severe bullying" exception would not provide a basis for K.H.'s suspension.  Therefore, it does not defeat plaintiffs' claim.

Defendants also contend that K.H.'s conduct caused substantial disruption to the School environment.  ECF 15-1 at 46.  But, plaintiffs dispute the contention.  They assert that only ten student statements were taken—six of which were voluntary, and four of which were requested by the School.  ECF 21 at 20, 24.  And, they argue that, out of a School population of 1,750 to 1,950 students, the involvement of ten students in the School's investigation cannot seriously be considered a substantial disruption.  *Id.* at 35–36.

Notably, in *Mahanoy*, 141 S. Ct. 2038, the Court said that discussions regarding the Snapchat posts over the course of a few days, even occurring in class and even upsetting some students, did not "sufficiently disrupt" the school environment so as to permit the school to regulate its student's out-of-school conduct.  Whether the School experienced a substantial disruption because of the Snap is a fact question that cannot be resolved at this stage of the case.

In any event, in their Motion, defendants seem to retreat from the claim of a substantial disruption at School.  Instead, they suggest that their actions were intended to *prevent* a possible disruption.  Specifically, defendants explain that the School desired "to avoid a racially hostile school environment," ECF 15-1 at 5, and to enable "SPHS students to focus on their school work without the distractions of a brewing in-school racial war erupting on its campus." *Id.* at 19.  They posit that "[t]he two-day suspension would give time for tensions to settle among students and also provide safety to K.H. from hostile students." *Id.* at 25.  Moreover, they claim that defendants had a duty to "protect[] [all SPHS students] from the harm caused by K.H.'s actions, because any failure to respond would have likely perpetuated a racially hostile school environment." ECF 31 at 10.  Therefore, defendants assert that their decision to suspend K.H. was intended "to protect

the entire SPHS student population from the development of a racially hostile environment that would likely result if K.H.'s misconduct was permitted without any accountability." *Id.*

Schools clearly have a legitimate and important interest in maintaining safety and decorum, and in avoiding disruption to the orderly operation of a school.[33]  Even so, "schools may not prohibit student speech because of 'undifferentiated fear or apprehension' or 'a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Morse*, 551 U.S. at 408–09 (quoting *Tinker*, 393 U.S. at 408).  In brief, a school's "abstract desire to avoid controversy" provides no basis for restricting a student's protected speech. *Morse*, 551 U.S. at 409.

---

[33] Suspension of a student in order to appease other students who might possibly take offense to certain speech, or out of fear of a potential disturbance, is somewhat akin to a "heckler's veto."  It is a fundamental principle of First Amendment jurisprudence that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (invalidating ordinance that allowed county administrator to adjust parade permit fees based on anticipated cost of security).

The Fourth Circuit has recognized that "one of the most persistent and insidious threats to first amendment rights has been that posed by the 'heckler's veto.'" *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985).  And, Fourth Circuit case law makes clear that permitting a heckler's veto is a *content*-based restriction on speech. *See, e.g.*, *Rock for Life–UMBC v. Hrabowski*, 411 F. App'x 541, 554 (4th Cir. 2010) ("Courts have recognized a heckler's veto as an impermissible form of content-based speech regulation for over sixty years.").  However, to my knowledge, the Fourth Circuit has not further characterized the heckler's veto as a form of *viewpoint*-based restriction.

Other circuits have addressed the heckler's veto in the context of viewpoint discrimination. In *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc), the Sixth Circuit said: "The heckler's veto is precisely that type of odious viewpoint discrimination."  The Third Circuit reached a similar conclusion in *Northeastern Pennsylvania Freethought Society v. County of Lackawanna Transit System*, 938 F.3d 424, 439 (3d Cir. 2019), stating that "censorship of messages because they are controversial is viewpoint discrimination."  In contrast, the Ninth Circuit has taken a more limited approach. *See Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 502–03 (9th Cir. 2015).

*Smith-Green Communnity School Corp.*, 807 F. Supp. 2d 767, illustrates this principle.  In that case, school officials suspended two high school students from extracurricular activities because, during the summer, while at a sleepover, the students posted sexually themed photos of themselves on their MySpace and Facebook pages.  *Id.* at 771.  At summary judgment, the court determined that the school failed to show that the conduct for which the students were disciplined caused or could be "reasonably forecast" to cause a substantial disruption of school activities.  *Id.* at 783–85.  The court explained that, to the extent the school attempted to show "actual disruption" by appealing to "[p]etty disagreements among players on a team," their showing "was incredibly weak."  *Id.* at 783.  Indeed, according to the court, the case at most "involved two complaints from parents and some petty sniping among a group of 15 and 16 year olds," hardly "what the Supreme Court had in mind when it enunciated the 'substantial disruption' standard in *Tinker*."  *Id.* at 784.

The school officials also attempted to justify the suspensions on the grounds that they were necessary to forestall a future disruption.  *Id.* at 784.  In particular, the school principal testified that he considered the suspensions appropriate because a "similar . . . incident" that occurred the previous year "took time and effort" to address.  *Id.*  The court disagreed.  In its view, such a "thin record does not support a determination as a matter of law that the school officials made a reasonable forecast of substantial disruption."  *Id.*  The court concluded, as a matter of law, "that the substantial disruption required by the *Tinker* test was not reasonably forecast."  *Id.*

Here, on a Saturday, from the privacy of her home, K.H. sent a photograph of herself to a small group of friends, with "no wording or remarks put on the photo," and with no intent to disseminate it beyond her small group.  ECF 2, ¶ 49.  The conduct did not relate to a School activity, School personnel, or another student.  It did not take place at an event at which School personnel were present.  And, accepting for present purposes plaintiffs' account as true, K.H. never

intended to demean or ridicule anyone, and her conduct resulted in a negligible disruption at School, involving only a handful of students.

With these facts in mind, I conclude that plaintiffs have stated a claim for violation of the right to free speech, as contained in both the First Amendment and Article 40 of the Maryland Declaration of Rights.

This conclusion does not end the inquiry, however.  This is because defendants have asserted qualified immunity with respect to Count IX.  *See* ECF 15-1 at 29–34.

### E. Qualified Immunity

The individual defendants assert qualified immunity with respect to plaintiff's First Amendment claim in Count IX, to the extent it is brought against them in their individual capacity. ECF 15-1 at 29–34.  "[U]nder Maryland law, federal qualified immunity is not a defense for state constitutional torts." *Borzilleri*, 189 F. Supp. 3d at 560 n.4. Therefore, the qualified immunity analysis pertains only to plaintiff's federal law claims.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'"  *Barrett v. PAE Gov't Servs., Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)); *see Younger*, 79 F.4th at 385; *Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023).  Countless cases support these principles. *See, e.g.*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021) (per curiam); *City of Tahlequah, Okla. v. Bond*, 595 U.S. 9 (2021) (per curiam); *Taylor v. Riojas*, 598 U.S. ___, 141 S. Ct. 52, 53 (2020); *Hulbert v. Pope*, 70 F. 4th 726, 732 (4th Cir. 2023); *Franklin v. City of Charlotte*, 64 F.4th 519, 530, 534–35 (4th Cir. 2023); *Hicks v. Ferreyra*, 64 F.4th 156, 169 (4th Cir. 2023); *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir.

2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___U.S.___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015).

The Fourth Circuit has reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Owens*, 767 F.3d at 395 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (alterations reflective of original quote in *Harlow*).  The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see Hicks*, 64 F.4th at 269; *Barrett*, 975 F.3d at 428–29; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015).

"A government official who is sued in his individual capacity may invoke qualified immunity."  *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.  And, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Pearson*, 555 U.S. at 231; *see also*, *e.g.*, *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282, 288 (4th Cir. 2021); *Ray v. Roane*, 948 F.3d 222, 229–30 (4th Cir. 2020); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson*, 912 F.3d at 186;  *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171,

175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582–83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland*, 730 F.3d at 391; *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Notably, qualified immunity is an "'immunity from suit rather than a mere defense to liability . . . .'" *Ussery v. Mansfield,* 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis removed).   Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'"   *Id.* at 337 (quoting *Mitchell*, 472 U.S. at 526).

The cases teach that qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'"   *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Robertson*, 989 F.3d at 288 ("'[I]n gray areas, where the law is unsettled or murky, qualified immunity affords protection to' government officials who take 'action[s] that [are] not clearly forbidden.'") (quoting *Occupy Columbia*, 738 F.3d at 118); *Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (observing that qualified immunity protects government officials from liability for "'bad guesses in gray areas'") (citation omitted). In other words, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"   *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5–6 (2013) (per curiam).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law."   *Harlow*, 457 U.S. at 818.  An officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity.

Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

Thus, "even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Goines*, 822 F.3d at 170)).

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018).  Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d

at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see also Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022); *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021); *Cannon*, 891 F.3d at 497; *Scinto*, 841 F.3d at 235. The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661–62; *accord Ray*, 948 F.3d at 226; *Sims*, 885 F.3d at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).[34]

"The plaintiff bears the burden of proof on the first question—*i.e.*, whether a constitutional violation occurred . . . . [and] [t]he defendant bears the burden of proof on the second question—*i.e.*, entitlement to qualified immunity." *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007) (internal citations omitted); *see also Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). In other words, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry*, 501 F.3d at 377 n.2 (citation omitted).

When an officer is shown to have violated the rights of a plaintiff, the court must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). The inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

---

[34] The Fourth Circuit has "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases." *Younger*, 79 F.4th at 385 n.17; *see Pfaller*, 55 F.4th at 445–48; *Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022). But, deliberate indifference is not at issue here.

If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818.  On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19.

Of import here, to determine whether the right was clearly established, the court first must define the right at issue.  *Hicks*, 64 F.4th at 170; *Scinto*, 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118.  "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Creighton*, 483 U.S. at 640).  Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself." *Owens*, 767 F.3d at 399; *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017).

Generally, to "determine whether a right is clearly established," courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[ ] the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, 893 F.3d at 221 (citation omitted); *see Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue), *cert. denied*, 562 U.S. 890 (2010).  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 574 U.S. at 16–17 (quoting *al-Kidd*, 563 U.S. at 741); *see Kisela v. Hughes*, 584 U.S.____, 138 S. Ct. 1148, 1152 (2018); *White*

*v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam); *San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015); *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014); *see also Reichle*, 566 U.S. at 664 ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'") (citation and some quotation marks omitted).

However, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221; *see Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Booker*, 855 F.3d at 544. Indeed, the Supreme Court has never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 580 U.S. at 79); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d at 582–83. Thus, "even without 'directly on-point, binding authority,' qualified immunity is inappropriate if 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Ray*, 948 F.3d at 229–30 (quoting *Booker*, 855 F.3d at 543).

But, as the Fourth Circuit has made clear, "[t]he Supreme Court has cautioned against defining a right with 'a high level of generality' . . . ." *Hicks*, 64 F.4th at 170 (quoting *Kisela*, 138 S. Ct. at 1152); *see Escondido v. Emmons*, 586 U.S. ___, 139 S.Ct. 500, 503 (2019); *Pauly*, 580 U.S. at 79; *Younger*, 79 F.4th at 385; *King v. Riley*, 76 F.4th 259, 266 (4th Cir. 2023); *Pfaller*, 55 F.4th at 445; *Wilson*, 893 F.3d at 221; *see also Sheehan*, 575 U.S. at 613–14; *Plumhoff*, 572 U.S. at 779. Rather, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at

86

227 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).  Meeting this requirement is sometimes easier said than done.[35]

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted."  *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015).  To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'"  *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

As noted, the second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt*, 565 U.S. at 546 (citing *Creighton*, 483 U.S. at 639).  If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful."  *Harlow*, 457 U.S. at 818.  On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19.

---

[35] In *Younger*, 79 F.4th 373, the Fourth Circuit stated that the district court "failed to heed this requirement."  *Id.* at 386 n.20.  In that case, which involved the brutal beating of a prisoner by correctional officers, the district court had defined the right at issue as a "prisoner's 'right to be protected from malicious attack . . . from the very officials tasked with ensuring their security.'" *Id.*  According to the Fourth Circuit, the district court was too general in defining the right.  *Id.*

Plaintiffs claim that the Student's rights were clearly established because the facts at hand are "virtually identical" to those in *Mahanoy Area Sch. Dist.*, 141 S. Ct. 2038, decided by the Supreme Court in June 2021.  *See* ECF 2, ¶¶ 99–102.  In their view, "*Mahanoy* stands for the proposition that, under the First Amendment, Board Defendants cannot regulate or control private off-campus speech, outside school hours, made by a student."  ECF 21 at 32.  They maintain that "[t]here was no intentional conduct by Student Doe targeting any student," and "there [is] scant evidence of any disruption to school functions or to any student's individual education."  *Id.* at 35.  Further, they observe that "'it is not required that a right violated already have been recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity."  *Id.* (quoting *Meyers v. Balt. Cnty., Md.*, 713 F.3d 723, 734 (4th Cir. 2013)).

In *Mahanoy*, as discussed, the Supreme Court determined that a student's First Amendment rights were violated when she was punished for speech that she made on social media while at home, outside of school hours.  Considering *Tinker*, *Morse*, and *Mahanoy*, I shall define the right at issue here as a public school student's right to engage in off-campus speech, outside of school hours, that does not involve a school activity, does not occur in the presence of school personnel, does not constitute bullying, and does not substantially disrupt the school environment or pose a serious risk of disruption.

Defendants contend that they are entitled to qualified immunity "[b]ecause each of them could reasonably have believed at the time K.H. was issued a two-day school suspension for her acknowledged actions that [she] created a hostile school environment and caused a disruption to the school day and school environment at SPHS, even though her actions were committed on a social media platform during non-school hours on a non-school day . . . ."  ECF 15-1 at 29. Defendants also assert that they were exercising their discretionary authority when they disciplined

K.H.  *Id.* at 31–32.  Further, they claim that, whereas *Mahanoy* "merely dealt with good manners and vulgar language and encompassed a message of criticism about a coach's decision," *id.* at 32, K.H. in this case caused a substantial disruption sufficient to meet the standard in *Tinker* and *Mahanoy*.  *Id.* at 33.  And, defendants maintain that because *Mahanoy* offered just "one example" of an unconstitutional speech restriction, it "did not establish a clear constitutional rule."  *Id.* at 33–34.

In my view, dismissal of plaintiffs' First Amendment claim on the ground of qualified immunity would be inappropriate at this stage.  Plaintiffs have plausibly alleged that defendants violated the right clearly established by the Supreme Court: K.H.'s right to engage in off-campus speech, outside school hours, that does not involve a school activity, does not occur in the presence of school personnel, does not constitute bullying, and does not substantially disrupt the school environment or pose serious risk of substantial disruption.

Defendants' asserted entitlement to qualified immunity rests on critical factual contentions that are disputed: that K.H. wore "blackface," and that the School environment was substantially "disrupted" by the Snap or faced a genuine threat of serious disruption.  The Court could grant qualified immunity on the grounds propounded by defendants only if the Court were to "presuppose the truth of defendants' version of events."  *Deegan*, 2017 WL 1194718, at *9.  But, when evaluating a motion to dismiss, I cannot adopt such a presupposition in defendants' favor.  Therefore, "while qualified immunity may be appropriate after discovery"—which could reveal important information about, *inter alia*, the extent to which the Snap substantially disrupted the School environment or presented a genuine risk of such disruption, if at all—"it is not appropriate now."  *Id.*

As to plaintiffs' due process claim (Count VI), defendants do not clearly assert that they are entitled to qualified immunity.  Instead, in both their Motion and their Reply, defendants' argument focuses on whether *Mahanoy* clearly established that the suspension of K.H. was unconstitutional under the First Amendment.  *See* ECF 15-1 at 30–34 ("[T]he 'Individual Defendants' are each entitled to qualified immunity because Plaintiffs' Amended Complaint ignores the fact the Supreme Court itself, in *Mahanoy*, did not establish a clear constitutional rule . . . ."); ECF 31 at 4–6.

To be sure, in defendants' discussion of qualified immunity, defendants assert that "there is definitely nothing shocking to the conscious [sic]" about K.H.'s discipline.  ECF 15-1 at 34.  Their reference to the "shock the conscience" standard, which pertains to the law of due process, is not an assertion of qualified immunity with respect to the due process claim.  And, in any event, defendants did not renew or develop this argument in their discussion of qualified immunity in their Reply.  *See* ECF 31 at 4–6.  Indeed, defendants' Reply seems to confirm that their assertion of qualified immunity is limited to the First Amendment claim.  *Id.* at 6 ("Thus, *Mahoney* [sic] did not clearly establish a clear constitutional rule . . . .").

In sum, the Court is unwilling to dismiss a claim on the basis of an argument that defendants have not themselves developed.  For that reason, I cannot find that defendants are, at this point in the litigation, entitled to qualified immunity with regard to plaintiffs' due process claim.

Accordingly, accepting plaintiffs' allegations as true, as I must, plaintiffs have adequately pleaded that defendants violated K.H.'s right to engage in protected off-campus speech, outside of school hours, because the speech did not concern a School activity, did not occur in the presence of School personnel, did not constitute bullying, and did not substantially disrupt the School environment or pose a genuine risk of substantial disruption.  As a result, defendants are not

entitled to qualified immunity at this stage.  *See West v. Shea*, 500 F. Supp. 3d 1079, 1087 (C.D. Cal. 2020) (denying defendants claim of qualified immunity at the motion to dismiss stage as to a claim of viewpoint discrimination on the ground that the evidentiary record was not yet fully developed).

### F. Article 24 (Due Process) (Count VI); Fourteenth Amendment (Count X)

In Count VI, plaintiffs assert a claim against defendants for "Violation of Rights Secured Under Article 24 of the Maryland Declaration of Rights."  *See* ECF 2, ¶¶ 155–74.  Article 24 of the Maryland Declaration of Rights provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

In particular, plaintiffs allege that defendants violated plaintiffs' rights "by providing less process than was due under Maryland law, depriving Plaintiff(s) of numerous protected rights and property interests, acting in an objectively unreasonable manner, and providing unequal protection under the law."  ECF 2, ¶ 161.  In addition, plaintiffs contend that the imposition of a two-day suspension violated the Student's rights.  They also claim that "Student Doe was in a special relationship, including an *in loco parentis* relationship, with Defendants under Maryland law." ECF 21 at 54.[36]

---

[36] In the Opposition, plaintiffs also argue that the School violated plaintiffs' substantive due process rights because plaintiffs have the right to raise their child as they see fit under the Fourteenth Amendment.  ECF 21 at 36.  Because this argument appears for the first time in the Opposition, it will not be considered.  *See, e.g., So. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 184 ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy.").

In addition, in Count X, plaintiffs allege that defendants violated their rights under the Due Process Clause in the Fourteenth Amendment to the Constitution.   ECF 2, ¶¶ 218-232. Specifically, they claim that defendants, *inter alia*, "deprived [them] of numerous protected property interests," *id.* ¶ 223, and "afforded [them] less process than was due under law. . . ." *Id.* ¶ 224.

I shall consider Counts VI and X together.

## 1.   Article 24

Article 24 is the State's constitutional guarantee of due process and equal protection of the law.   *Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 41 n.11, 838 A.2d 1225, 1237 n.11 (2003).   Ordinarily, Article 24 is interpreted *in pari materia* with the Fourteenth Amendment to the United States Constitution.   *See Littleton v. Swonger*, 502 F. App'x 271, 274 (4th Cir. 2012); *Verderamo v. Mayor and City Council of Balt.*, 4 F. Supp. 3d 722, 732–33 (D. Md. 2014); *Meyers v. Balt. Cnty.*, 981 F. Supp. 2d 422, 430 (D. Md. 2013); *Frey v. Comptroller of Treasury*, 422 Md. 111, 176, 29 A.3d 475, 513 (2011); *see also Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496 (D. Md. 2013) (Article 24 "is the state law equivalent of the Fourteenth Amendment of the United States") (quotation marks omitted); *Doe v. Dep't of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (Article 24 "is *in pari materia* with the Due Process Clause of the Fourteenth Amendment").[37]

---

[37] Plaintiffs assert that "Article 24 is not always read in para [sic] materia with the United States Constitution . . . ."   ECF 21 at 53.   They state: "'Article 24 and the Fourteenth Amendment are independent and capable of divergent effect.'"   *Id.* at 51 (quoting *Tyler v. City of College Park*, 415 Md. 475, 499–500, 3A.3d 421, 435 (2010)); *see also Okwa v. Harper*, 360 Md. 161, 200–01, 757 A.2d 118, 139–40 (2008).

In Counts VI through IX, plaintiffs baldly assert, without any facts, that defendants engaged in "a policy, pattern, and/or practice of in action" that harmed plaintiffs.   ECF 2, ¶ 167;

In other words, Article 24 "has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.'"  *Frey*, 422 Md. at 176, 29 A.3d at 513 (quoting *Attorney Gen. of Md. v. Waldron*, 289 Md. 683, 704, 426 A.2d 929, 941 (1981)). "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Hawkins*, 955 F. Supp. 2d at 496.

The Due Process Clause of the Fourteenth Amendment forbids the government from depriving a person of "life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.  Like the Fourteenth Amendment, Article 24 "require[s] the defendant to be a state actor." *Anisimov v. Hosp. Partners, LLC*, CCB-09-2536, 2010 WL 723755, at *3 (D. Md. Feb. 24, 2010).

The "standard analysis" under the Due Process Clause asks "whether there exists a liberty or property interest of which a person has been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219

---

*see also id.* ¶¶ 169, 183, 185, 199, 215.  Defendants do not address these allegations and plaintiffs only raise the issue sparingly in their Opposition.  ECF 21 at 55–56.

A pattern and practice claim generally pertains to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), in which the Supreme Court determined that a local governmental body may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government, resulting in a violation of the plaintiff's rights.  *Id.* at 690–91.  A viable *Monell* claim consists of two components; 1) an unconstitutional policy or custom of the municipality; 2) and the unconstitutional policy or custom caused a violation of the plaintiff's rights.  *See*, *e.g.*, *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Washington v. Hous. Auth. of the City of Colum.*, 58 F.4th 170, 177 (4th Cir. 2023); *Kirby v. City of Elizabeth City*, 388 F.3d 446, 451 (4th Cir. 2004); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

Here, to the extent that plaintiffs are attempting to raise a *Monell* claim, such allegations are woefully deficient, as no case law, facts, or allegations are presented.

(2011). "[S]ubstantive due process is a substantially narrower concept than procedural due process, for it serves as 'an absolute check on certain governmental actions notwithstanding the fairness of the procedures' used to implement those actions." *Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 287–88 (4th Cir. 1998) (citation omitted) (emphasis in *Front Royal*). "[T]his absolute check is warranted only where no process could cure the deficiencies in the governmental action." *Id.* at 288 (internal citation omitted) (emphasis in original); *see Reyna as Next Friend of J.F.G. v. Hott*, 921 F.3d 204, 211 (4th Cir. 2019) (cautioning against recognizing new substantive rights).

## 2.  Procedural Due Process

"'The root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing before he is deprived of any significant property [or liberty] interest.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (emphasis in original) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)); *see Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (citation omitted); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (observing that procedural due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); *Sansotta*, 724 F.3d at 540 (recognizing that procedural protections under the Due Process Clause attach to liberty as well as property interests); *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014) ("At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard."), *cert. denied*, 572 U.S. 1135 (2014).  Yet, "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place

94

and circumstances.'" *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961)).

"Typically, a procedural due process issue is evaluated under the balancing standard that the Supreme Court articulated" in *Mathews*, 424 U.S. 319. *D.B. v. Cardall*, 826 F.3d 721, 742 (4th Cir. 2016). Under that standard, a court balances three factors, *id.*:

> (1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements.

It is well established that students have a due process right in their education. In *Goss v. Lopez*, 419 U.S. 565, 581 (1975), the Court said: "Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Maryland law establishes a similar right. *See also, e.g.*, *Thomas v. Allegany Cnty. Bd. of Ed.*, 51 Md. App. 312, 319, 443 A.2d 622, 627 (1982) (recognizing "right of Maryland students to a free public school education").

"When school officials suspend or expel a student, it triggers the student's property interest in a public education." *Stevenson ex rel. Stevenson v. Martin Cnty. Bd. of Educ.*, 3 F. App'x 25, 29 (4th Cir. 2001) (citing *Goss*, 419 U.S. at 572–76 (1975)). Further, "[w]here the state provides free public education, students have a legitimate property interest in that education that cannot be deprived without notice and the opportunity to be heard." *Dennis v. Bd. of Educ. of Talbot Cnty.*, 21 F. Supp. 3d 497, 505 (D. Md. 2014). Such notice requires that defendants are "made aware of the charges against them, written or orally, and the evidence upon which those charges are based." *Id.* at 506 (citing *Goss*, 419 U.S. at 581).

Defendants do not dispute that K.H. has a property interest in her education.  ECF 15-1 at 47–48.  However, defendants argue that K.H. received due process because she was "afforded the opportunity to be heard and to tell her side of the story; and based upon her presentation of what transpired, there is no dispute that she violated School Board policies, administrative regulations, and the code of conduct, all of which resulted in the school discipline she received."  *Id.* at 48.  Further, defendants argue that plaintiffs were given due process because "K.H.'s parents were permitted to appeal the decision to issue K.H. a suspension and were repeatedly afforded the opportunity to present any and all arguments for rescinding the suspension of K.H."  *Id.*

In their Opposition, plaintiffs assert that the K.H. "was deprived of her property interest in his [sic] education and had her substantive due process rights deprived."  ECF 21 at 54.  They argue that K.H. did not receive adequate due process, claiming that, throughout the appeal documents and the pleadings, defendants "have listed a plethora of reasons outside that letter in which Student Doe was suspended," which were also not mentioned in Robinson's disposition on the appeal.  *Id.* at 37–38.  Thus, plaintiffs argue that, "[t]o the extent that Student Doe was issued punishment where she was not on notice of the grounds to defend against the charges or mitigate the sentencing, her due process rights have been violated."  *Id.* at 38.  Further, plaintiffs argue that K.H.'s due process rights have been violated "to the extent that Student Doe's conduct did not fit under the prohibited conduct, but she was punished anyway," and "to the extent that the regulations in which Student Doe was punished violate the First Amendment by prohibiting conduct that is expressly permitted under *Mahanoy*."  *Id.*

As summarized earlier, the Handbook outlines students' due process rights, ECF 15-16 at 25:

**Right to Due Process and Appeal**
When students are alleged to have violated a school regulation, they have the right to certain due process protections.  This means that they are entitled to notice of the allegations against them and the opportunity to respond to the allegations.
If a student is suspended for 10 or fewer days or believes that an action taken by the school is a violation of policy, the parent may use the student complaint process, Board of Education Policy JCH and Administrative Regulation JCH-RA, to initiate an appeal in writing to the principal who will forward the appeal to the Regional Assistant Superintendent.

Further, the Handbook defines "Due Process" as meaning that "[a] student facing suspension must be given oral or written notice of the allegations and the opportunity to be heard." *Id.* at 37.

Additionally, the bias regulation, "JO-RA" (ECF 15-15), contains a due process section.  It explains that remedial actions for students who commit acts of bias behavior as well as those who make "false accusations shall be consistently and fairly applied after appropriate investigation has determined that such an offense has occurred."  ECF 15-15 at 4–5, § D(3)(a).  Moreover, "[a] principal shall take necessary action to ensure that instances of bias behavior and language are addressed promptly, fairly, and effectively."  *Id.* at 5, § D(3)(a)(i).

The Suspension Letter, signed by both Bathras and Chang, stated, in part, ECF 34-1 at 1:

> Your daughter, [K.H.], has been placed on short-term suspension for two (2) days from school for violation of Board of Education Policy of Anne Arundel County Public Schools JCC-Student Conduct -JCC-JO-RA Bias Motivated Behavior and Misuse of Social Media.  Specifically, [K.H.] posted an offensive picture via SnapChat of her face painted in brown paint with a stick figure drawn on her neck.  She sent this picture to a group of her SPHS peers, which included two students of color.  This incident also caused a major disruption to the normal operations of the school day for students and staff.

However, the exhibits discussed earlier suggest that K.H.'s suspension may have been based on reasons other than those about which plaintiffs and K.H. were informed.  For example, in Bathras's denial of Mr. Heward's appeal, he stated: "Our investigation showed that the same group of peers has told [K.H.] previously (prior to this incident) that [K.H.] sometimes says jokes

or other comments that are racially offensive or can be construed as offensive, specifically to the students of color in the group of peers that were directly involved in this incident." ECF 36-2 at 4 (sealing notice at ECF 15-23). He added that "the students of color feel as though they must be hesitant or must ignore such racially offensive comments because those students of color are in fear of retribution, retaliation, or falling out of favor with [K.H.]." *Id.*

In the Motion, defendants recount the investigations' findings, as follows, ECF 15-1 at 23–24:

1. K.H. admitted during the investigation what she did and acknowledged she was wrong;
2. K.H. used brown and gold face paint on her face and it was extremely troubling that she drew a stick figure on her neck, as that was indicative of mocking of an actual person;
3. K.H. was joking around and not intending to represent a personal position or stance;
4. K.H. involved in a prior encounter with a Black SPHS student where K.H. told the student "Can't see you [in the photo] because you're so dark;"
5. That same Black SPHS student told K.H. to stop that type of behavior on multiple occasions, including the day of the K.H. Photo; and told K.H. the hurtfulness of the photograph;
6. That same Black SPHS student was severely impacted and found that the K.H. Photo was super-offensive and tried to individually explain this to K.H.;
7. K.H. understood the offensive nature of the K.H. Photo and went through with sending it anyway;
8. K.H. tried to dictate who could be offended by the K.H. Photo by essentially saying "Black people can be offended, others can't;"
9. K.H. had engaged in prior misconduct earlier in the school year relating to the disparagement of another student based upon their sexual orientation;
10. K.H. had engaged in prior conduct on social media during the school day that was disparaging about a particular candidate for SPHS's Homecoming princess.
11. The intentional conduct required for a violation of policy was the action of sending the K.H. Photo regardless of whether or not such conduct was intended to be offensive or harmful. There is no dispute that K.H. sent the K.H. Photo to other SPHS students and recipients of the K.H. Photo were offended and/or severely impacted.

Yet, the Suspension Letter did not include all of these findings. *See* ECF 34-1. Indeed, defendants have not shown when, how, or if plaintiffs were put on notice of the allegations in points 4, 5, 9, or 10, and whether they had a chance to respond to such allegations.

Accepting as true the allegations in the Amended Complaint and the exhibits,[38] consistent with Rule 12(b)(6), I conclude that plaintiffs have adequately pleaded a violation of K.H.'s right to notice and an opportunity to heard with respect to the grounds of her suspension.  In particular, plaintiffs' allegations that (1) K.H.'s suspension was based on facts unrelated to the Snap, and of which K.H. had no notice; and (2) the pre-suspension investigation of the circumstances of the Snap occurred summarily, *i.e.*, over the course of a few hours (ECF 2, ¶76; ECF 15-1 at 24), are sufficient to state a claim for a procedural due process violation.

Therefore, I shall deny the Motion as to Counts VI and X, insofar as these Counts rest on a claim of violation of the right to procedural due process.

### 3.  Substantive Due Process

Plaintiffs also appear to allege a violation of K.H.'s substantive due process rights.  *See* ECF 2, ¶¶ 218–232; ECF 21 at 54.  Defendants respond that the suspension of K.H. is not a due process violation because a two-day suspension does not "shock the conscious [sic]."  ECF 15-1 at 47.  In their view, there was a "rational relationship between the punishment and the offense."  *Id.*  Plaintiffs fail to respond to this argument.

Although plaintiffs' invocation of substantive due process is cryptic and unsupported by citations to authority, I shall consider it out of an abundance of caution.

The thread of substantive due process case law that seems most pertinent to plaintiffs' allegations concerns constitutional limits on executive action. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) (distinguishing between substantive due process analysis for

---

[38] For the purposes of analyzing the issue, I rely on the allegations set forth in the Amended Complaint, as well as exhibits integral to the suit, such as the Suspension Letter (ECF 34-1), documents concerning the appeal of the suspension (ECF 34-3, ECF 34-5 to ECF 34-7, ECF 36-1 to ECF 36-2), the Board's policies and regulations (ECF 15-10 to ECF 15-15), and the Student Handbook (ECF 15-16).

legislative and executive acts).  This line of cases posits that "the Due Process Clause was intended to prevent government officials 'from abusing [their] power, or employing it as an instrument of oppression.'"  *Id.* at 846 (citations and some internal quotation marks omitted).  Notably, "the cognizable level of executive abuse of power [is] that which shocks the conscience."  *Id.*; *see Rosales-Mireles v. United States*, 585 U.S. ——, 138 S. Ct. 1897, 1906 (2018); *Huggins v. Prince George's Cnty., Md.*, 683 F.3d 525, 535 (2012); *see also Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009) ("Only abuse of power which 'shocks the conscience' creates a substantive due process violation.") (citation omitted).

The Supreme Court has cautioned: "The Due Process Clause 'does not purport to supplant traditional tort law.'"  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986)).  "Defining conduct that shocks the conscience does not draw on any traditional standard of liability from tort law but rather refers, as a constitutional construct of substantive due process, to 'conduct intended to injure in some way unjustifiable by any government interest.'"  *Slaughter v. Mayor and City Council of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012) (citation omitted); *see Waybright v. Frederick Cnty.*, 528 F.3d 199, 205 (4th Cir. 2008) ("The shocks-the-conscience test turns on degree of fault.").  Therefore, it should not "be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law."  *Collins*, 503 U.S. at 128.  Further, the Fourth Circuit has admonished that courts must exercise "self-restraint" and "utmost care," carefully scrutinizing the circumstances "before any abuse of power is condemned as conscience shocking."  *Waybright*, 528 F.3d at 205 (internal quotation marks and citations omitted).

In my view, the two-day suspension alleged by plaintiffs does not shock the conscience. The cases in this realm "typically feature quite extreme governmental wrongdoing."  *Waybright*,

528 F.3d at 208; *compare Rochin v. California*, 342 U.S. 165 (1952) (pumping a suspect's stomach to look for drugs violated substantive due process), *with Doe v. Gooden*, 214 F.3d 952, 954–55 (8th Cir. 2000) (declining to find violation of substantive due process where teacher psychologically tormented her classroom of elementary school students because "[v]erbal abuse is normally not a constitutional violation").

Plaintiffs' allegations, even if true, would establish at most that the School imposed a procedurally defective and unjustified two-day suspension.  Such actions are not conscience-shocking.

In their Opposition, plaintiffs state with respect to their due process claim that "Student Doe was in a special relationship . . . with Defendants under Maryland law."  ECF 21 at 54.  They assert that "the actions of Defendants arbitrarily deprived Student Doe of his [sic] liberties . . . by, among other things, allowing abuse and excessive force against Student Doe."  *Id.*  However, the Amended Complaint contains no allegations of "abuse" or "excessive force."

The "special relationship" doctrine is an exception to the general rule of non-liability for wrongdoing by a third party.  *See DeShaney v. Winnebago Cty. Dept of Soc. Servs.*, 489 U.S. 189, 195 (1989); *Stevenson*, 3 F. App'x at 30–31.  In the context of due process, courts generally hold that a student is not in a special relationship with her school.  *See Stevenson*, 3 F. App'x at 30–31; *see also O.W. by Next Friend Bass v. Sch. Bd. of City of Virginia Beach*, ___ F. Supp. 3d ___, 2023 WL 1994355, at *14 (E.D. Va., Feb. 14, 2023); *Doe #1*, 2021 WL 6072813, at *10.

Plaintiffs' cursory invocation in their Opposition of the "special relationship" doctrine seems unrelated to their central allegation that K.H.'s suspension was a violation of her rights, including to substantive due process.  Moreover, their reference to "excessive force" against K.H.

is puzzling. Plaintiffs have not asserted a substantive due process claim on the basis of such confusing allegations and contentions.

Accordingly, I shall grant the Motion with respect to Counts VI and X insofar as these counts rest on a theory of the right to substantive due process.

### G. Common Law Tort Claims

### 1. Negligence (Count I)

Count I asserts a claim of Negligence.  In particular, plaintiffs allege that defendants "owed a duty to parents and students, including Student Doe and the Plaintiffs, to provide for the safety and care of students when those students are in their custody and control." ECF 2, ¶ 118.  Plaintiffs claim that defendants breached this duty "when engaging in inappropriate, improper, non-constructive, non-educational, and unsafe acts directed at Student Doe or failing to engage in appropriate, proper, constructive, educational and safe acts with Student Doe."  *Id*. ¶ 122.

Specifically, plaintiffs allege, *id*. ¶ 124:

. . . Defendant Board, through its agents, servants, and/or employees, breached their aforementioned duties by failing to perform a reasonable investigation into any allegations against Student Doe; failing to properly follow and interpret Defendant Board's Student Handbook; failing to act with reasonable care and handle the aforementioned incident as someone using reasonable care would do; failing to employee [sic] properly trained staff to deal with situations such as Student Doe's; failing to properly train existing staff to handle and implement solutions to situations such as Student Doe's; failing to protect Student Doe from backlash surrounding Defendant's Board's decision; failing to implement a plan and/or offer resources for Student Doe to ensure her successful reintegration into the student body; failing to take into account the repercussions of suspending a 13-year old child for painting her face gold and labeling her as a racially insensitive individual; failing to see that all students are treated equally; failing to not be unduly pressured into making improper decisions and suspensions based on a complainant's race/ethnicity; failing to ensure that unsafe and dangerous conduct of its students is addressed in a timely manner; failing to ensure that any cyberbullying and in-person bullying of Student Doe by its students is addressed in a timely manner; failing to properly inform students of the facts surrounding the School Spirit Snap incident; failing to not "rubber stamp" complaints without investigating the facts behind the complaints with reasonable care and/or diligence; failing to provide a safe

environment for all its students at Severna Park High School, specifically, to Student Doe; failing to protect Student Doe from harm while at Severna Park High School; failing to treat Student Doe in a manner which didn't violate her constitutional rights; failing to treat her consistent will all federal and state laws; and failing to otherwise act in a non-negligent manner.

Further, plaintiffs allege that, "as a direct and proximate result of the negligence of Defendant Board, Plaintiff has suffered, and will continue to suffer in the future, great suffering, mental anguish, reputational damage, out-of-pocket losses; past and future medical expenses, personal humiliation; psychological injuries; lost and/or diminished earnings (in part, because now she, more likely than not, will not be admitted into a reputable college while suspension remains in her file), and other non-economic damages recoverable under the law." *Id.* ¶ 125.

Defendants argue that they "are entitled to public official immunity against Plaintiffs' negligence claim." ECF 15-1 at 35. They cite a host of cases—only one of which is from Maryland—recognizing public official immunity for school principals. *Id.* at 36 (citing *Kapiloff v. Dunn*, 27 Md. App. 514, 524 (1975)). However, plaintiffs point out that "the Appellate Court of Maryland has held that a [school] superintendent is not granted public official immunity." ECF 21 at 39 (citing *Berg v. Merricks*, 20 Md. App. 666, 679 (1974)). Plaintiffs also explain that "Maryland law has conclusively established that public school teachers are not public officials." *Id.* (citing *Duncan v. Koustenis*, 260 Md. 98, 105–06 (1970)). But, defendants counter that although "school teachers are not public officials," the defendants here are "school administrators" who are "public officials" entitled to public official immunity. ECF 31 at 6.

In general, to assert a claim of negligence in Maryland, the plaintiff must allege the following elements: "1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of that duty." *Steamfitters Loc.*

*Union No. 602 v. Erie Ins. Exch. No. 40*, 469 Md. 704, 727, 233 A.3d 59, 72 (2020); *see also*

*Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 611, 155 A.3d

445, 451 (2017) (citing *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212–

13, 60 A.3d 1, 10 (2013)); *see Schultz v. Bank of Am.*, N.A., 413 Md. 15, 27, 990 A.2d 1078, 1086

(2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a

duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a

legally cognizable causal relationship between the breach of duty and the harm suffered, and

damages.'" (Quoting *Jacques v. First Nat. Bank of Md.*, 307 Md. 527, 531, 515 A.2d 756, 758

(1986)) (alterations in *Schultz*).

    In the tort context, Maryland courts have recognized "'the doctrine that the relation of a

school vis a vis a pupil is analogous to one who stands in *loco parentis*, with the result that a school

is under a special duty to exercise reasonable care to protect a pupil from harm.'" *Gambrill*, 481

Md. at 315, 281 A.3d at 900 (quoting *Eisel v. Bd. of Educ. of Montgomery Cnty.*, 324 Md. 376,

597 A.2d 447, 451–52 (1991)); *see also Loveless v. Estevez*, No. 01985, Sept. Term 2017, 2019

WL 4187465, at *6 (Md. Ct. Spec. App. Sept. 3, 2019) ("[S]chool authorities have a common law

duty, 'as the temporary custodians of children, to exercise reasonable care for their protection.'")

(quoting *Collins v. Bd. of Educ. of Kent Cnty.*, 48 Md. App. 213, 218, 426 A.2d 10, 13 (1981)).[39]

    Public official immunity is a legal defense available to certain limited classes of local

government employees. *DiPino v. Davis*, 354 Md. 18, 729 A.2d 354 (1999). For public official

immunity to apply, it must be shown that (1) the actor is a public official, "rather than a mere

government employee or agent"; (2) the alleged tortious conduct "occurred while the actor was

---

[39] As the court observed in *Doe*, 888 F. Supp. 2d at 669, "the standard" to prove negligence
under State tort law "is lower than the standard" for a due process violation.

performing discretionary, as opposed to ministerial, acts"; and (3) the actor committed the relevant acts "within the scope of his official duties." *Thomas v. City of Annapolis*, 113 Md. App. 440, 452, 688 A.2d 448 (1997); *see D'Aoust v. Diamond*, 424 Md. 549, 587, 36 A.3d 941, 963 (2012).

To determine whether an actor is a public official, courts examine four factors: (1) "whether the position was created by law and involves continuing and not occasional duties," (2) "whether the holder performs an important public duty," (3) "whether the position calls for the exercise of some portion of the sovereign power of the State," and (4) whether the position has a definite term for which a commission is issued and a bond or oath are required." *de la Puente v. Cnty. Comm'rs of Frederick Cnty.*, 386 Md. 505, 511, 873 A.2d 366, 370 (2005) (quoting *James v. Prince George's Cnty.*, 288 Md. 315, 324, 428 A.2d 1173, 1178 (1980), *superseded on other grounds by Prince George's Cnty. v. Fizhugh*, 308 Md. 384, 519 A.2d 1285 (1987)); *see also D'Aoust*, 424 Md. at 587, 36 A.2d at 963.

A position created by law has been understood to mean that "(a) the office was created by Constitutional or legislative enactment, such as a statute or a local ordinance; (b) an oath is generally prescribed; and (c) a commission is issued." *de la Puente*, 386 Md. at 512, 873 A.2d at 370.

However, these guidelines are not exclusive, but "are employed using the specific facts and circumstances of each individual's position." *Id.* at 512, 873 A.2d at 370 (citing *James*, 288 Md. at 324, 418 A.2d at 1178). Even if a person's position fails to meet these criteria, "that individual may be 'nevertheless considered a public official' if he or she meets" either exception: (1) the individual "exercises 'a large portion of the sovereign power of government'" or (2) the individual "can be called on to exercise police powers as a conservator of the peace." *de la Puente*, 386 Md. at 512, 873 A.2d at 370 (quoting *Duncan*, 260 Md. at 106, 271 A.2d at 551 (cleaned up)).

In *Marks v. Rivers*, No. 1810, Sept. Term 2021, 2022 WL 17547223 (Md. Ct. Spec. App. Dec. 9, 2022), the Maryland Court of Special Appeals considered the duties of a school principal in light of case law concerning public official immunity and explained, *id.* at *3 (emphasis added):

> Further, inasmuch as the position of public school principal is created by law, it is predicated by [sic] the position of public school teacher. The Maryland Code provides for an "administrator track" for "develop[ing] teachers into principals." Md. Code (1978, 2018 Repl. Vol., 2021 Suppl.), § 6-1006 of the Education Article. Accordingly, in order to become a public school principal under the statute, an individual must first be a public school teacher. Maryland law has conclusively established that public school teachers are not public officials. *Duncan*, *supra*, 260 Md. at 105; s*ee also Jekofsky v. State Roads Comm'n*, 264 Md. 471 (1972). **In our view, a public school principal is akin to a public school teacher with additional responsibilities. Accordingly, absent any indication otherwise, a public school principal is similarly not a public official. Our holding that a public school principal is not a public official is in accordance with prior case law holding that a public school superintendent is not a public official**. *See Baltimore City v. Lyman*, 92 Md. 591 (1901). Indeed, if a public school superintendent is not a public official, it stands to reason that a public school principal who reports to the local public school superintendent is also not a public official.

Defendants have provided no relevant Maryland authority refuting the conclusion in *Marks* that "Maryland law has conclusively established that public school teachers are not public officials." *Id.* And, the factors outlined in *de la Puente* weigh in favor of plaintiffs. Therefore, on the basis of the allegations in the suit, I cannot say as a matter of law that defendants are public officials for the purpose of public official immunity. It follows that dismissal on the basis of public official immunity is not appropriate.

Defendants also seek dismissal of the negligence claim to the extent that it is one of educational malpractice. ECF 15-1 at 39. Plaintiffs respond that the claim does not educational malpractice but, rather, "student safety, injuries, torts, and abuse." ECF 21 at 42.

"The educational malpractice doctrine applies when a court is 'asked to evaluate the course of instruction'" or is "'called upon to review the soundness of the method of teaching that has been

adopted by an educational institution.'"  *Gambrill*, 481 Md. at 309, 281 A.3d at 897 (quoting *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992)) (brackets omitted); *see Paladino v. Adelphi Univ.*, 89 A.D. 2d 85, 90 (N.Y. 1982).   But, in Maryland, a court may not adjudicate claims concerning the quality of education provided by an educational institution.  *See Gurbani v. Johns Hopkins Health Sys. Corp.*, 237 Md. App. 261, 293, 185 A.3d 760, 770 (2018).  This is because Maryland does not recognize a claim for educational negligence.  *See Robinson v. Bd. of Educ. of Wash. Cnty.*, No. 1:22-CV-01102-ELH, 2023 WL 2499854, at *18 (D. Md. Mar. 14, 2023); *Carroll v. Walden Univ.*, LLC, JRR-22-00051, 2022 WL 17252556, at *22 (D. Md. Nov. 28, 2022); *Hunter v. Bd. of Educ. of Montgomery Cnty.,* 292 Md. 481, 490, 439 A.2d 582, 587 (1982).

The educational malpractice doctrine is limited to cases seeking review of "pedagogical decisions."  *Gambrill*, 481 Md. at 312, 281 A.3d at 898.  It does not extend to claims related to student safety.  *See*, *e.g.*, *Willey v. Bd. of Educ. of St. Mary's Cnty*, 557 F. Supp. 3d 645 (D. Md. 2021) (concluding that plaintiff's claim that school failed to protect students from harm "is not a matter of educational policymaking" and therefore is not barred by the educational malpractice doctrine); *Gandy*, 2021 WL 3911892, at *7 (holding educational malpractice doctrine did not bar claim that "teachers were unfamiliar with the unique behavioral needs of special education students, which increased the chance that Student Doe would suffer physical harm").   And, plaintiffs' claim concerns defendants' purported failure to protect Student Doe from harm.

The educational malpractice doctrine is not implicated here.  As a result, it does not provide a basis for dismissal.  Therefore, I shall deny the Motion as to Count I.

### 2. Invasion of Privacy (Counts II & III)

In Count II, entitled "Invasion of Privacy (Unreasonable Publicity)", plaintiffs incorporate preceding paragraphs and also allege, ECF 2, ¶¶ 130–36:

130. Board Defendants intentionally publicized Plaintiffs['] private facts.

131. Plaintiffs' private facts are not and were not [a] valid concern to the public.

132. Student Doe did not consent, and because of Student Doe's age and mental condition, could not consent to Defendants' actions.

133. Student Doe's parents did not consent to Defendants' actions.

134. Defendants' publication would be highly offensive to a reasonable person.

135. The actions of Board Defendants were performed intentionally and with malice.

136. As a direct and proximate result of these acts/actions/inactions/omissions, by Board Defendant(s), individually and/or by and through its/their agents, servants, and employees, Plaintiff(s) have/has sustained legally recognized damages, injuries, losses, and harms.

In Count III, titled "Invasion of Privacy (False Light)", plaintiffs incorporate preceding paragraphs and allege, *id*. at ¶¶ 138–44:

138. Board Defendants intentionally gave publicity to a matter concerning Plaintiffs that places Plaintiff before the public in a false light.

139. The false light in which Plaintiffs were placed would be highly offensive to a reasonable person.

140. Board Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed.

141. Student Doe did not consent, and because of Student Doe's age and mental condition, could not consent to Defendants' actions.

142. Student Doe's parents did not consent to Board Defendants' actions. Defendants' publication would be highly offensive to a reasonable person.

143. The actions of Board Defendants were performed intentionally and with malice.

144. As a direct and proximate result of these acts/actions/inactions/omissions, by Board Defendant(s), individually and/or by and through its/their agents, servants, and employees, Plaintiff(s) have/has sustained legally recognized damages, injuries, losses, and harms.

Defendants contend: "Plaintiffs' 'Invasion of Privacy' allegations asserted in Counts II and III are conclusory and clearly fail to meet the requisite *Iqbal* pleading standards." ECF 15-1 at 41.

The tort of unreasonable publicity is cognizable when one "'gives publicity to a matter concerning the private life of another' and 'the matter publicized is of a kind which (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.'" *Lindenmuth v. McCreer*, 233 Md. App. 343, 364, 165 A.3d 544, 556 (2017) (quoting *Furman v.*

*Sheppard*, 130 Md. App. 67, 77 (2000)).   And, to establish a claim for false light invasion of privacy, "a plaintiff must allege that a defendant has given 'publicity to a matter concerning another that places the other before the public in a false light . . . if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Alston v. Balt. Gas & Elec. Co.*, ELH-22-1061, 2023 WL 1472020, at *26 (D. Md. Feb. 1, 2023) (quoting *Chinwuba v. Larsen*, 142 Md. App. 327, 359 n.8, 790 A.2d 83, 102 n.8 (2002), *rev'd on other grounds*, 377 Md. 92, 832 A.2d 193 (2003)); *see Furman v. Sheppard*, 130 Md. App. 67, 77, 744 A.2d 583, 587 (2000); *Bagwell v. Peninsula Regional Medical Center*, 106 Md. App. 470, 514, 665 A.2d 297, 318 (1995) (Hollander, J.); *see also Holt v. Camus*, 128 F. Supp. 2d 812, 816 (D. Md. 1999).

Plaintiffs do not identify what it is that defendants "intentionally publicized" that was "private."   Indeed, there is no identification of "Defendants' publication."   And, in the absence of these critical factual allegations, there is no way for a factfinder to determine whether the publication, if proven, "would be highly offensive to a reasonable person." *Lindenmuth*, 233 Md. App. at 364, 165 A.3d at 556.

Moreover, an invasion of privacy claim requires "publicity," meaning that "the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." RESTATEMENT (SECOND) OF TORTS § 652D cmt. a.   "[I]t is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Id.* Yet, there are no allegations in the suit of what was made public and to whom. *See Henderson v. Claire's Stores, Inc.*, 607 F. Supp. 2d 725, 733 (D. Md. 2009) (holding that accusations of use of

a stolen credit card made in front of a small group of individuals in a store did not constitute publicity for purposes of a false light invasion of privacy claim); *see also Wells v. Thomas*, 569 F. Supp. 426, 437 (E.D. Pa. 1983) (holding that the publicity element was not met where facts were verbally communicated to employees at a staff meeting and in conversations between employees); *Beard v. Akzona, Inc.*, 517 F. Supp. 128, 132–33 (E.D. Tenn. 1981) (holding that publicity element was not met when embarrassing facts about one employee were disclosed to five other employees in management).

In sum, plaintiffs fail to allege "who" specifically invaded plaintiffs' privacy, "how" their privacy was invaded, "when" their privacy was invaded, and "what" was publicized that amounted to an invasion of their privacy. Accordingly, I shall dismiss Counts II and III of the Amended Complaint, without prejudice.

### 3. Defamation (Count IV)

Count IV lodges a defamation claim against defendants. ECF 2, ¶ 25. In particular, plaintiffs incorporate preceding paragraphs and also allege, *id.* at ¶¶ 146–50:

> 146. Board Defendants made defamatory statement(s) to a third person.
> 147. Those defamatory statements were false.
> 148. Board Defendants were legally at fault in making the statement.
> 149. The actions of Board Defendants were performed intentionally and with malice.
> 150. As a direct and proximate result of these acts/actions/inactions/omissions, by Board Defendant(s), individually and/or by and through its/their agents, servants, and employees, Plaintiff(s) have/has sustained legally recognized damages, injuries, losses, and harms.

Defendants contend: "Plaintiffs fail to state a claim of defamation *per se* or defamation *per quod*." ECF 15-1 at 43. They urge dismissal of the defamation claim on the ground that plaintiffs have not identified the defamatory statement or the identity of the person who supposedly made

the statement, nor have they identified the person to whom the statement was made.  *Id.* at 42–44.[40]

Under Maryland, for a statement to be actionable as defamation, "it must 'tend[] to expose a person to public scorn, hatred, contempt[,] or ridicule.'"  *Throwe*, 957 F.3d at 483 (quoting *Seley-Radtke v. Hosmane*, 450 Md. 468, 482, 149 A.3d 573, 581 (2016)) (brackets in *Throwe*).  And, "as a general matter under the First Amendment, a defamatory statement must also be something 'susceptible of being proved true or false.'"  *Throwe*, 957 F.3d at 483 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990)).

In a claim for defamation *per se*, the "defamatory character of the statement must be imputed by the 'words themselves.'"  *Baker-Proctor v. PNC Bank, N.A.*, DKC-21-3299, 2023 WL 1801932, at *2 (D. Md. Feb. 7, 2023).  In contrast, in a defamation *per quod* claim, the defamatory character of the statement must be imputed "by the context in which the words were said."  *Id.*

In their Opposition, plaintiffs assert only that defendants' conduct was "*per se* defamatory."  ECF 21 at 48.  Because plaintiffs have abandoned a claim of defamation *per quod*, the Court will analyze only the claim of defamation *per se*.  *Vennie v. Md. Transit Admin.*, ELH-

---

[40] Defendants initially argued for dismissal on the basis that the claim was filed outside of the one-year statute of limitations applicable to defamation claims.  ECF 15-1 at 43 (citing Md. Code, C.J. § 5-105).  In particular, defendants assert that the facts underlying the case occurred in October 2021, but the defamation claim was not filed until "December 28, 2022," *i.e.*, more than a year later.  However, plaintiffs respond by noting that the claim was initially filed on October 17, 2022.  ECF 21 at 47 (citing ECF 1-1).  Defendants do not renew this argument in the Reply.  *See* ECF 31.

The alleged defamatory conduct, *i.e.*, the suspension, investigation, and bias training, occurred no earlier than October 19, 2021.  And "'the limitations period begins to run on the date the statements are improperly communicated.'"  *Degross v. Office Depot, LLC*, JKB-22-291, 2023 WL 2456830, at *4 (D. Md. Mar. 10, 2023) (quoting *Long v. Welch & Rushe, Inc.*, 28 F. Supp. 3d 446, 456 (D. Md. 2014) in turn citing *Bagwell*, 106 Md. App. at 512, 665 A.2d at 318).  Thus, it appears that plaintiffs' defamation claim was timely filed.

19-03277, 2020 WL 4582713, at *1 (D. Md. Aug. 7, 2020) ("'By her failure to respond to [defendant's] argument' in a motion to dismiss, 'the plaintiff abandons [her] claim.'") (quoting *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010)).

"Under Maryland law, a properly pleaded defamation claim is accompanied by specific facts establishing the following four elements: '(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'" *Baker-Proctor*, 2023 WL 1801932, at *2 (quoting *Piscatelli v. Van Smith*, 424 Md. 294, 306 35 A.3d 1140, 1147 (2012)).

"Although a plaintiff need not plead a defamation claim under the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, the pleadings in a defamation case must still be sufficiently detailed to enable a defendant to appropriately respond." *Estate of Jones v. St. Thomas More Nursing & Rehab Ctr*., PJM-09-1419, 2009 WL 3247929, at *3 (D. Md. Oct. 1, 2009). Moreover, every "alleged defamatory statement constitutes 'a separate instance of defamation,' which 'a plaintiff must specifically allege.'" *Gainsburg v. Steben & Co*., 838 F. Supp. 2d 339, 344 (D. Md. 2011) (quoting *English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*, 1999 WL 89125, at *3 (4th Cir. 1999); *see also Doe v. Salisbury Univ*., 123 F. Supp. 3d 748, 758 (D. Md. 2015) ("To satisfy federal pleading standards, a plaintiff must specifically allege each defamatory statement.").

Here, plaintiffs fail to allege that defendants made any potentially defamatory statements. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *See Iqbal*, 556 U.S. at 681, 685. Therefore, plaintiffs' defamation claim in Count IV falls woefully short of meeting the *Twombly-Iqbal* pleading standard. *See Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 684.

Accordingly, I shall dismiss Count IV, without prejudice.

### 4. Breach of Fiduciary Duty (Count V)

Plaintiffs also assert a claim for breach of fiduciary duty.  ECF 2, ¶¶ 151–54.  Specifically,

they incorporate preceding paragraphs and allege as follows, *id*.:

> 152. A fiduciary relationship existed between Plaintiff(s) and Board Defendant(s).
> 153. Board Defendant(s) breached the duty owed by the fiduciary (Board Defendant(s)) to the beneficiary (Plaintiff(s)).
> 154. As a direct and proximate result of these acts/actions/inactions/omissions, by Board Defendant(s), Plaintiff(s) have/has sustained legally recognized damages, injuries, losses, and harms.

To establish a breach of fiduciary duty as an independent cause of action in Maryland, a

plaintiff must demonstrate: "(i) the existence of a fiduciary relationship; (ii) breach of the duty

owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary."  *Plank v. Cherneski*,

469 Md. 548, 599, 231 A.3d 436, 466 (2020) (quoting *Froelich v. Erickson*, 96 F. Supp. 2d 507,

526 (D. Md. 2000)); *see Gandy*, 2021 WL 3911892, at *6 n.4.

Defendants contend that plaintiffs fail to state a claim, as they neither identify the existence

of a fiduciary duty that is owed to them, nor do they state when and how such a duty was breached.

ECF 15-1 at 44–45.  In response, plaintiffs aver that Maryland recognizes a fiduciary relationship

between a student and school officials, and that defendants violated that duty when they suspended

Student Doe.  ECF 21 at 48–50.  In reply, defendants argue that even if such a duty was owed to

plaintiffs, they have not alleged a breach with sufficient specificity to survive the Motion.  ECF 31

at 7.

"The elements of a breach of fiduciary duty claim mirror the elements of a negligence

claim."  *Gandy*, 2021 WL 3911892, at *5 n.4.  In general, a fiduciary relationship may exist

between parties "by common law, by statute, or by contract."  *Plank*, 469 Md. at 597, 231 A.3d at

465.  Further, "'[w]ell-known examples of habitual or categorical fiduciary relationships include

those between trustees and beneficiaries, agents and principals, directors and corporations, lawyers and clients, and guardians and wards, as well as the relationship among partners.'" *Id.* at 598, 231 A.3d at 465–66 (quoting Deborah A. DeMott, *Relationships of Trust and Confidence in the Workplace*, 100 CORNELL L. REV. 1255, 1261 (2015)).

As discussed, the Amended Complaint adequately states a claim for negligence. Therefore, the Court will permit the plaintiffs to proceed on their breach of fiduciary duty claim in Count XII. *See Doe #1 v. Bd. of Educ. of Somerset Cnty.*, RDB-22-1491, 2023 WL 375189, at *6 (D. Md. Jan. 24, 2023); *Gandy*, 2021 WL 3911892, at *4 n.4; *but see Brummell v. Talbot Cnty. Bd. of Educ.*, RDB-22-1601, 2023 WL 2537438, at *8 (D. Md. Mar. 16, 2023) (rejecting extension of negligence claim to include breach of fiduciary duty by school board).

### H. Article 26: Freedom from Search and Seizure (Count VII)

In Count VII, plaintiffs assert a claim against all defendants for "Violation of Rights Secured Under Article 26 of the Maryland Declaration of Rights." ECF 2, ¶¶ 175–90. Defendants argue that "[t]here are no factual allegations in the Amended Complaint asserting or claiming that any defendant conducted any type of school search and/or any type of seizure of K.H" and argue that defendants are thus "entitled to dismissal or summary judgment in [their] favor." ECF 15-1 at 49.

In their Opposition, "Plaintiffs agree that Article 26 claims should be dismissed without prejudice with leave to Amend only upon a motion." ECF 21 at 56. Accordingly, I shall dismiss Count VII for failure to state a claim, without prejudice.

### IV.  Conclusion

In light of the foregoing, I shall grant the Motion in part and deny it in part. In particular, I shall dismiss, without prejudice, Count II (Invasion of Privacy (Unreasonable Publicity)); Count

III (Invasion of Privacy (False Light)); Count IV (Defamation); Count VII (Article 26, Freedom from Search and Seizure); and Count VI (Article 24, Due Process) and Count X (Fourteenth Amendment), insofar as counts VI and X are based on a claim of violation of the right to substantive due process.  However, I shall deny the Motion with respect to Count I (Negligence); Count V (Breach of Fiduciary Duty); Count VIII (Article 40, Free Speech); Article IX (First Amendment); and Count VI (Article 24 Due Process) and Count X (Fourteenth Amendment), insofar as Counts VI and X are premised on a theory of a violation of procedural due process.

An Order follows, consistent with this Memorandum Opinion.


Date: September 29, 2023                                       _____/s/_____
                                                              Ellen L. Hollander
                                                              United States District Judge